## IRVINE *v.* CALIFORNIA.

No. 12.   Argued November 30, 1953.—Decided February 8, 1954.

*Morris Lavine* argued the cause and filed a brief for petitioner.

*Elizabeth Miller,* Deputy Attorney General of California, and *Clarence A. Linn,* Assistant Attorney General, argued the cause for respondent. With them on the brief were *Edmund G. Brown,* Attorney General, and *William V. O'Connor,* Chief Deputy Attorney General.

MR. JUSTICE JACKSON announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE REED and MR. JUSTICE MINTON join.

This case involves constitutional questions growing out of methods employed to convict petitioner on charges of horse-race bookmaking and related offenses [1] against the antigambling laws of California.[2] Petitioner exhausted all avenues to relief under state procedures and then sought review here of duly raised federal issues.

We granted certiorari [3] on a petition which tendered four questions. However, petitioner's counsel has now presented two additional questions, one concerning the application of an immunity statute of California and another attacking certain instructions given to the jury by the trial court. Neither of these was mentioned in the petition. We disapprove the practice of smuggling additional questions into a case after we grant certiorari. The issues here are fixed by the petition unless we limit the grant, as frequently we do to avoid settled, frivolous

---

[1] Keeping premises with paraphernalia for the purpose of recording and registering bets on horse racing, receiving money and the equivalent thereof which had been or was to be wagered on horse races, and recording and registering bets on horse races.

[2] Deering's Cal. Penal Code, 1949, §§ 337a (1), (2), (3), and (4).

[3] 345 U. S. 903.

or state law questions. We do not take up the questions numbered 3 and 6 of petitioner's brief because they are improperly presented.

Upon his arrest, petitioner had on his person a federal wagering tax stamp bearing his name, home address and the date, November 5, 1951. Against objection, it and other documentary evidence from the office of the United States Collector of Internal Revenue was received to show petitioner's application for the wagering tax stamp and his return to the Collector under the federal law. These documents were made pursuant to the Federal Act imposing wagering taxes, 65 Stat. 529, 26 U. S. C. (Supp. V) § 3285 *et seq.,* held constitutional by this Court in *United States* v. *Kahriger,* 345 U. S. 22. The claim is made that it was error as a matter of federal law to admit this evidence and also that payment of the federal tax resulted in a federal license to conduct the wagering business. This statute does not make such records or stamps confidential or privileged but, on the contrary, expressly requires the name and place of business of each such taxpayer to be made public. 53 Stat. 395, 26 U. S. C. § 3275. Petitioner's contentions are without substance or merit in view of the express provision of the statute that payment of the tax does not exempt any person from penalty or punishment by state law and does not authorize commencement or continuance of such business. 53 Stat. 395, 26 U. S. C. § 3276; 65 Stat. 531, 26 U. S. C. (Supp. V) § 3292.[4]

But the questions raised by the officers' conduct while investigating this case are serious. The police strongly suspected petitioner of illegal bookmaking but were without proof of it. On December 1, 1951, while Irvine and his wife were absent from their home, an officer ar-

---

[4] Petitioner's question number 2, which challenges the State's use of "compelled evidence" obtained under the federal wagering statute, is answered in *United States* v. *Kahriger, supra,* at 32.

ranged to have a locksmith go there and make a door key. Two days later, again in the absence of occupants, officers and a technician made entry into the home by the use of this key and installed a concealed microphone in the hall. A hole was bored in the roof of the house and wires were strung to transmit to a neighboring garage whatever sounds the microphone might pick up. Officers were posted in the garage to listen. On December 8, police again made surreptitious entry and moved the microphone, this time hiding it in the bedroom. Twenty days later, they again entered and placed the microphone in a closet, where the device remained until its purpose of enabling the officers to overhear incriminating statements was accomplished.

We should note that this is not a conventional instance of "wire tapping." Here the apparatus of the officers was not in any way connected with the telephone facilities, there was no interference with the communications system, there was no interception of any message. All that was heard through the microphone was what an eavesdropper, hidden in the hall, the bedroom, or the closet, might have heard. We do not suppose it is illegal to testify to what another person is heard to say merely because he is saying it into a telephone. We cannot sustain the contention that the conduct or reception of the evidence violated the Federal Communications Act. 48 Stat. 1103, 47 U. S. C. § 605. Cf. *Nardone* v. *United States,* 308 U. S. 338; *Goldman* v. *United States,* 316 U. S. 129; *Schwartz* v. *Texas,* 344 U. S. 199.

At the trial, officers were allowed to testify to conversations heard through their listening installations. The snatches of conversation which the prosecution thought useful were received in evidence. They were in the lingo of the race track and need not be recited, but the jury might well have regarded them as incriminating. The testimony was received under objection, properly

raising the question that it was constitutionally inadmissible since obtained by methods which violate the Fourteenth Amendment.

Each of these repeated entries of petitioner's home without a search warrant or other process was a trespass, and probably a burglary, for which any unofficial person should be, and probably would be, severely punished. Science has perfected amplifying and recording devices to become frightening instruments of surveillance and invasion of privacy, whether by the policeman, the blackmailer, or the busybody. That officers of the law would break and enter a home, secrete such a device, even in a bedroom, and listen to the conversation of the occupants for over a month would be almost incredible if it were not admitted. Few police measures have come to our attention that more flagrantly, deliberately, and persistently violated the fundamental principle declared by the Fourth Amendment as a restriction on the Federal Government that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The decision in *Wolf* v. *Colorado,* 338 U. S. 25, 27, for the first time established that "[t]he security of one's privacy against arbitrary intrusion by the police" is embodied in the concept of due process found in the Fourteenth Amendment.

But *Wolf,* for reasons set forth therein, declined to make the subsidiary procedural and evidentiary doctrines developed by the federal courts limitations on the states. On the contrary, it declared, "We hold, therefore, that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure."

338 U. S. 25, 33.   See *Stefanelli* v. *Minard,* 342 U. S. 117, 119, 122.   That holding would seem to control here.

An effort is made, however, to bring this case under the sway of *Rochin* v. *California,* 342 U. S. 165.   That case involved, among other things, an illegal search of the defendant's person.   But it also presented an element totally lacking here—coercion (as the Court noted, p. 173), applied by a physical assault upon his person to compel submission to the use of a stomach pump.   This was the feature which led to a result in *Rochin* contrary to that in *Wolf.*   Although *Rochin* raised the search-and-seizure question, this Court studiously avoided it and never once mentioned the *Wolf* case.   Obviously, it thought that illegal search and seizure alone did not call for reversal.   However obnoxious are the facts in the case before us, they do not involve coercion, violence or brutality to the person, but rather a trespass to property, plus eavesdropping.

It is suggested, however, that although we affirmed the conviction in *Wolf,* we should reverse here because this invasion of privacy is more shocking, more offensive, than the one involved there.   The opinions in *Wolf* were written entirely in the abstract and did not disclose the details of the constitutional violation.   Actually, the search was offensive to the law in the same respect, if not the same degree, as here.   A deputy sheriff and others went to a doctor's office without a warrant and seized his appointment book, searched through it to learn the names of all his patients, looked up and interrogated certain of them, and filed an information against the doctor on the information that the District Attorney had obtained from the books.   The books also were introduced in evidence against the doctor at his trial.

We are urged to make inroads upon *Wolf* by holding that it applies only to searches and seizures which pro-

duce on our minds a mild shock, while if the shock is more serious, the states must exclude the evidence or we will reverse the conviction. We think that the *Wolf* decision should not be overruled, for the reasons so persuasively stated therein. We think, too, that a distinction of the kind urged would leave the rule so indefinite that no state court could know what it should rule in order to keep its processes on solid constitutional ground.

Even as to the substantive rule governing federal searches in violation of the Fourth Amendment, both the Court and individual Justices have wavered considerably. Compare *Harris* v. *United States,* 331 U. S. 145; *Trupiano* v. *United States,* 334 U. S. 699; *United States* v. *Rabinowitz,* 339 U. S. 56; *Brinegar* v. *United States,* 338 U. S. 160; *Goldman* v. *United States,* 316 U. S. 129; *On Lee* v. *United States,* 343 U. S. 747. Never until June of 1949 did this Court hold the basic search-and-seizure prohibition in any way applicable to the states under the Fourteenth Amendment. At that time, as we pointed out, thirty-one states were not following the federal rule excluding illegally obtained evidence, while sixteen were in agreement with it. Now that the *Wolf* doctrine is known to them, state courts may wish further to reconsider their evidentiary rules. But to upset state convictions even before the states have had adequate opportunity to adopt or reject the rule would be an unwarranted use of federal power. The chief burden of administering criminal justice rests upon state courts. To impose upon them the hazard of federal reversal for noncompliance with standards as to which this Court and its members have been so inconstant and inconsistent would not be justified. We adhere to *Wolf* as stating the law of search-and-seizure cases and decline to introduce vague and subjective distinctions.

Whether to exclude illegally obtained evidence in federal trials is left largely to our discretion, for admissibility

of evidence is governed "by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. Rules Crim. Proc., 26. As we have pointed out, reason has led state courts to differing conclusions, but about two-thirds of them to acceptance of the illegally obtained evidence. What actual experience teaches we really do not know. Our cases evidence the fact that the federal rule of exclusion and our reversal of conviction for its violation are not sanctions which put an end to illegal search and seizure by federal officers. The rule was announced in 1914 in *Weeks* v. *United States,* 232 U. S. 383. The extent to which the practice was curtailed, if at all, is doubtful. The lower federal courts, and even this Court,[5] have repeatedly been constrained to enforce

---

[5] *E. g., Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *Gouled* v. *United States,* 255 U. S. 298; *Amos* v. *United States,* 255 U. S. 313; *Agnello* v. *United States,* 269 U. S. 20; *Byars* v. *United States,* 273 U. S. 28; *Gambino* v. *United States,* 275 U. S. 310; *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344; *United States* v. *Lefkowitz,* 285 U. S. 452; *Taylor* v. *United States,* 286 U. S. 1; *Grau* v. *United States,* 287 U. S. 124; *Nathanson* v. *United States,* 290 U. S. 41; *United States* v. *Di Re,* 332 U. S. 581; *Johnson* v. *United States,* 333 U. S. 10; *Trupiano* v. *United States,* 334 U. S. 699; *McDonald* v. *United States,* 335 U. S. 451; *Lustig* v. *United States,* 338 U. S. 74; *United States* v. *Jeffers,* 342 U. S. 48. The Court has also cited the doctrine with approval in many related cases. *E. g., Perlman* v. *United States,* 247 U. S. 7; *Burdeau* v. *McDowell,* 256 U. S. 465; *Carroll* v. *United States,* 267 U. S. 132; *McGuire* v. *United States,* 273 U. S. 95; *Marron* v. *United States,* 275 U. S. 192; *Olmstead* v. *United States,* 277 U. S. 438; *Palko* v. *Connecticut,* 302 U. S. 319; *Goldstein* v. *United States,* 316 U. S. 114; *McNabb* v. *United States,* 318 U. S. 332; *Feldman* v. *United States,* 322 U. S. 487; *Davis* v. *United States,* 328 U. S. 582; *Zap* v. *United States,* 328 U. S. 624; *Harris* v. *United States,* 331 U. S. 145; *United States* v. *Wallace & Tiernan Co.,* 336 U. S. 793; *United States* v. *Rabinowitz,* 339 U. S. 56; *On Lee* v. *United States,* 343 U. S. 747. See Appendix to dissenting opinion of MR. JUSTICE FRANKFURTER in *Harris* v. *United States, supra,* at 175.

the rule after its violation. There is no reliable evidence known to us that inhabitants of those states which exclude the evidence suffer less from lawless searches and seizures than those of states that admit it. Even this Court has not seen fit to exclude illegally seized evidence in federal cases unless a federal officer perpretrated the wrong. Private detectives may use methods to obtain evidence not open to officers of the law. *Burdeau* v. *McDowell,* 256 U. S. 465; see *McGuire* v. *United States,* 273 U. S. 95, 99; cf. *Feldman* v. *United States,* 322 U. S. 487; *Lustig* v. *United States,* 338 U. S. 74. And the lower federal courts, treating the Fourth Amendment right as personal to the one asserting it, have held that he who objects must claim some proprietary or possessory interest in that which was unlawfully searched or seized. *E. g., Connolly* v. *Medalie,* 58 F. 2d 629; *Steeber* v. *United States,* 198 F. 2d 615, 617. See *Goldstein* v. *United States,* 316 U. S. 114, 121; *Wolf* v. *Colorado, supra,* at 30–31. Cf. *United States* v. *Jeffers,* 342 U. S. 48.

It must be remembered that petitioner is not invoking the Constitution to prevent or punish a violation of his federal right recognized in *Wolf* or to recover reparations for the violation. He is invoking it only to set aside his own conviction of crime. That the rule of exclusion and reversal results in the escape of guilty persons is more capable of demonstration than that it deters invasions of right by the police. The case is made, so far as the police are concerned, when they announce that they have arrested their man. Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy against one lawbreaker because he has been pursued by another. It protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches. The disciplinary or educa-

tional effect of the court's releasing the defendant for police misbehavior is so indirect as to be no more than a mild deterrent at best. Some discretion is still left to the states in criminal cases, for which they are largely responsible, and we think it is for them to determine which rule best serves them.

But admission of the evidence does not exonerate the officers and their aides if they have violated defendant's constitutional rights. It was pointed out in *Wolf* v. *Colorado, supra,* that other remedies are available for official lawlessness, although too often those remedies are of no practical avail. The difficulty with them is in part due to the failure of interested parties to inform of the offense. No matter what an illegal raid turns up, police are unlikely to inform on themselves or each other. If it turns up nothing incriminating, the innocent victim usually does not care to take steps which will air the fact that he has been under suspicion. And the prospect that the guilty may capitalize on the official wrongdoing in his defense, or to obtain reversal from a higher court, removes any motive he might have to inform.

It appears to the writer, in which view he is supported by THE CHIEF JUSTICE, that there is no lack of remedy if an unconstitutional wrong has been done in this instance without upsetting a justifiable conviction of this common gambler. If the officials have willfully deprived a citizen of the United States of a right or privilege secured to him by the Fourteenth Amendment, that being the right to be secure in his home against unreasonable searches, as defined in *Wolf* v. *Colorado, supra,* their conduct may constitute a federal crime under 62 Stat. 696, 18 U. S. C. (Supp. III) § 242. This section provides that whoever, under color of any law, statute, ordinance, regulation or custom, willfully subjects any inhabitant of any state to the deprivation of any rights, privileges or immunities secured or protected by the Constitution of the United

States shall be fined or imprisoned. See *Williams* v. *United States,* 341 U. S. 97; *Screws* v. *United States,* 325 U. S. 91. It does not appear that the statute of limitations yet bars prosecutions. 45 Stat. 51, 18 U. S. C. § 582. We believe the Clerk of this Court should be directed to forward a copy of the record in this case, together with a copy of this opinion, for attention of the Attorney General of the United States. However, MR. JUSTICE REED and MR. JUSTICE MINTON do not join in this paragraph.

*Judgment affirmed.*

MR. JUSTICE CLARK, concurring.

Had I been here in 1949 when *Wolf* was decided, I would have applied the doctrine of *Weeks* v. *United States,* 232 U. S. 383 (1914), to the states. But the Court refused to do so then, and it still refuses today. Thus *Wolf* remains the law and, as such, is entitled to the respect of this Court's membership.

Of course, we could sterilize the rule announced in *Wolf* by adopting a case-by-case approach to due process, in which inchoate notions of propriety concerning local police conduct guide our decisions. But this makes for such uncertainty and unpredictability that it would be impossible to foretell—other than by guesswork—just how brazen the invasion of the intimate privacies of one's home must be in order to shock itself into the protective arms of the Constitution. In truth, the practical result of this *ad hoc* approach is simply that when five Justices are sufficiently revolted by local police action, a conviction is overturned and a guilty man may go free. *Rochin* bears witness to this. We may thus vindicate the abstract principle of due process, but we do not shape the conduct of local police one whit; unpredictable reversals on dissimilar fact situations are not likely to curb the zeal of those police and prosecutors who may be intent on racking up a high percentage of successful prosecu-

tions.   I do not believe that the extension of such a vacillating course beyond the clear cases of physical coercion and brutality, such as *Rochin,* would serve a useful purpose.

In light of the "incredible" activity of the police here, it is with great reluctance that I follow *Wolf.*   Perhaps strict adherence to the tenor of that decision may produce needed converts for its extinction.   Thus I merely concur in the judgment of affirmance.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

I would reverse this conviction because the petitioner Irvine was found guilty of a crime and sentenced to prison on evidence extorted from him by the Federal Government in violation of the Fifth Amendment.

Federal law makes it a crime punishable by fine, imprisonment, or both, for a person to run a gambling business without making a report to the Government and buying a federal wagering tax stamp, both of which reveal his gambling operations.[1]   Petitioner made the necessary report of his gambling activities in California and bought the required tax stamp.   The information he gave and the stamp he bought were used in this case to convict and sentence him to prison for violating California's antigambling law.   For reasons given in my dissent in *United States* v. *Kahriger,* 345 U. S. 22, 36, I believe the federal law that extracted the disclosures and required the tax stamp violates the Fifth Amendment's command that a person shall not be compelled to be a witness against himself.   But even though the law is valid, as the Court held, *use* of such forced confessions to convict the confessors still amounts to compelling a person to testify against himself in violation of the Fifth Amendment.

---

[1] 65 Stat. 529, 26 U. S. C. (Supp. V) §§ 3285, 3287.

I cannot agree that the Amendment's guarantee against self-incrimination testimony can be spirited away by the ingenious contrivance of using federally extorted confessions to convict of state crimes and vice versa.[2] Licensing such easy evasion of the Amendment has proven a heavy drain on its vitality although no such debilitating interpretation was given the Amendment by this Court until it decided *United States* v. *Murdock* in 1931, one hundred and forty years after the Bill of Rights was adopted.[3] That construction was rested on the premise that a state and the United States are so separate and foreign to one another that neither of them need protect witnesses against being forced to admit offenses against the laws of the other.[4] This treatment of the states and the Federal Government as though they were entirely foreign to each other is wholly conceptualistic and cannot justify such a narrow interpretation of the Fifth Amendment's language and the resulting frustration of its purpose.

I think the Fifth Amendment of itself forbids all federal agents, legislative, executive and judicial, to force a person to confess a crime; forbids the use of such a federally coerced confession in any court, state or federal; and forbids all federal courts to use a confession which a person has been compelled to make against his will.

---

[2] See my dissent in *Feldman* v. *United States*, 322 U. S. 487, 494.

[3] 284 U. S. 141, and see *United States* v. *The Saline Bank of Virginia*, 1 Pet. 100; *Brown* v. *Walker*, 161 U. S. 591, 606, 608; *Ballmann* v. *Fagin*, 200 U. S. 186; *Vajtauer* v. *Commissioner of Immigration*, 273 U. S. 103; *United States* v. *Murdock*, 290 U. S. 389, 396.

[4] Reliance for this view was placed mainly on two English cases, *King of the Two Sicilies* v. *Willcox*, 7 State Trials (N. S.) 1049, and *Queen* v. *Boyes*, 1 B. & S. 311. 284 U. S., at 149. See discussion of these two cases as related to the Fifth Amendment privilege against self-incrimination in Grant, Immunity from Compulsory Self-Incrimination, 9 Temp. L. Q. 57–70 and 194–212, particularly 59–62 and 196–204.

The Fifth Amendment forbids the Federal Government and the agents through which it acts—courts, grand juries, prosecutors, marshals or other officers—to use physical torture, psychological pressure, threats of fines, imprisonment or prosecution, or other governmental pressure to force a person to testify against himself. And if the Federal Government does extract incriminating testimony, as the Court has held it may in compelling gamblers to confess, the immunity provided by the Amendment should at the very least prevent the use of such testimony in any court, federal or state.[5] The use of such testimony is barred, even though the Fifth Amendment may not of itself prohibit the states or their agents from extorting incriminating testimony.[6] The Amendment does plainly prohibit all federal agencies from using their power to force self-incriminatory statements. Consequently, since the Amendment is the supreme law of the land and is binding on all American judges, the use of federally coerced testimony to convict a person of crime in any court, state or federal, is forbidden.

The Fifth Amendment not only forbids agents of the *Federal Government* to compel a person to be a witness against himself; it forbids federal courts to convict persons on their own forced testimony, whatever "sovereign"—federal or state—may have compelled it. Otherwise, the constitutional mandate against self-incrimination is an illusory safeguard that collapses whenever a confession is extorted by anyone other than the Federal Government.

Though not essential to disposition of this case, it seems appropriate to add that I think the Fourteenth Amendment makes the Fifth Amendment applicable to states

---

[5] *Counselman* v. *Hitchcock,* 142 U. S. 547.

[6] See *Barron* v. *Baltimore,* 7 Pet. 243.

and that state courts like federal courts are therefore barred from convicting a person for crime on testimony which either state or federal officers have compelled him to give against himself.[7]   The construction I give to the Fifth and Fourteenth Amendments makes it possible for me to adhere to what we said in *Ashcraft* v. *Tennessee,* 322 U. S. 143, 155, that "The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession."

So far as this case is concerned it is enough for me that Irvine was convicted in a state court on a confession coerced by the Federal Government.   I believe this frustrates a basic purpose of the Fifth Amendment—to free Americans from fear that federal power could be used to compel them to confess conduct or beliefs in order to take away their life, liberty or property.   For this reason I would reverse Irvine's conviction.

It has been suggested that the Court should call on the Attorney General to investigate this record in order to start criminal prosecutions against certain California officers.   I would strongly object to any such action by this Court.   It is inconsistent with my own view of the judicial function in our government.   Prosecution, or anything approaching it, should, I think, be left to government officers whose duty that is.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON joins, dissenting.

Mere failure to have an appropriate warrant for arrest or search, without aggravating circumstances of misconduct in obtaining evidence, invalidates a federal conviction helped by such an unreasonable search and seizure.

---

[7] *Adamson* v. *California,* 332 U. S. 46, 68 (dissenting opinion); *Rochin* v. *California,* 342 U. S. 165, 174 (concurring opinion).

Such was the construction placed upon the Fourth Amendment by *Weeks* v. *United States,* 232 U. S. 383. But *Wolf* v. *Colorado,* 338 U. S. 25, held that the rule of the *Weeks* case was not to be deemed part of the Due Process Clause of the Fourteenth Amendment and hence was not binding upon the States. Still more recently, however, in *Rochin* v. *California,* 342 U. S. 165, the Court held that "stomach pumping" to obtain morphine capsules, later used as evidence in a trial, was offensive to prevailing notions of fairness in the conduct of a prosecution and therefore invalidated a resulting conviction as contrary to the Due Process Clause.

The comprehending principle of these two cases is at the heart of "due process." The judicial enforcement of the Due Process Clause is the very antithesis of a Procrustean rule. In its first full-dress discussion of the Due Process Clause of the Fourteenth Amendment, the Court defined the nature of the problem as a "gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." *Davidson* v. *New Orleans,* 96 U. S. 97, 104. The series of cases whereby, in the light of this attitude, the scope of the Due Process Clause has been unfolded is the most striking, because the liveliest, manifestation of the wide and deep areas of law in which adjudication "depends upon differences of degree. The whole law does so as soon as it is civilized." Holmes, J., concurring in *LeRoy Fibre Co.* v. *Chicago, M. & St. P. R. Co.,* 232 U. S. 340, 354. It is especially true of the concept of due process that between the differences of degree which that inherently undefinable concept entails "and the simple universality of the rules in the Twelve Tables or the Leges Barbarorum, there lies the culture of two thousand years." *Ibid.*

In the *Wolf* case, the Court rejected one absolute. In *Rochin,* it rejected another.

In holding that not all conduct which by federal law is an unreasonable search and seizure vitiates a conviction in connection with which it transpires, *Wolf* did not and could not decide that as long as relevant evidence adequately supports a conviction, it is immaterial how such evidence was acquired. For the exact holding of that case is defined by the question to which the opinion addressed itself: "Does a conviction by a State court for a State offense deny the 'due process of law' required by the Fourteenth Amendment, solely because evidence that was admitted at the trial was obtained under circumstances which would have rendered it inadmissible in a prosecution for violation of a federal law in a court of the United States because there deemed to be an infraction of the Fourth Amendment as applied in *Weeks* v. *United States,* 232 U. S. 383?" Thus, *Wolf* did not change prior applications of the requirements of due process, whereby this Court considered the whole course of events by which a conviction was obtained and was not restricted to consideration of the trustworthiness of the evidence.

*Rochin* decided that the Due Process Clause of the Fourteenth Amendment does not leave States free in their prosecutions for crime. The Clause puts limits on the wide discretion of a State in the process of enforcing its criminal law. The holding of the case is that a State cannot resort to methods that offend civilized standards of decency and fairness. The conviction in the *Rochin* case was found to offend due process not because evidence had been obtained through an unauthorized search and seizure or was the fruit of compulsory self-incrimination. Neither of these concepts, relevant to federal prosecutions, was invoked by the Court in *Rochin,* so of course the *Wolf* case was not mentioned. While there is in the case before us, as there was in *Rochin,* an element of unreasonable search and seizure, what is

decisive here, as in *Rochin,* is additional aggravating conduct which the Court finds repulsive.

Thus, the basis on which this case should be adjudicated is laid down in *Rochin:* "Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'" 342 U. S., at 169, quoting from *Malinski* v. *New York,* 324 U. S. 401, at 416–417.

This brings us to the specific circumstances of this case. This is a summary of the conduct of the police:

(1) They secretly made a key to the Irvines' front door.

(2) By boring a hole in the roof of the house and using the key they had made to enter, they installed a secret microphone in the Irvine house with a listening post in a neighboring garage where officers listened in relays.

(3) Using their key, they entered the house twice again to move the microphone in order to cut out interference from a fluorescent lamp. The first time they moved it into Mr. and Mrs. Irvine's bedroom, and later into their bedroom closet.

(4) Using their key, they entered the house on the night of the arrest and in the course of the arrest made a search for which they had no warrant.

There was lacking here physical violence, even to the restricted extent employed in *Rochin.* We have here, however, a more powerful and offensive control over the Irvines' life than a single, limited physical trespass. Cer-

tainly the conduct of the police here went far beyond a bare search and seizure. The police devised means to hear every word that was said in the Irvine household for more than a month. Those affirming the conviction find that this conduct, in its entirety, is "almost incredible if it were not admitted." Surely the Court does not propose to announce a new absolute, namely, that even the most reprehensible means for securing a conviction will not taint a verdict so long as the body of the accused was not touched by State officials. Considering the progress that scientific devices are making in extracting evidence without violence or bodily harm, satisfaction of due process would depend on the astuteness and subtlety with which the police engage in offensive practices and drastically invade privacy without authority of law. In words that seem too prophetic of this case, it has been said that "[d]iscovery and invention have made it possible for the Government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet." Brandeis, J., dissenting in *Olmstead* v. *United States,* 277 U. S. 438, 473.

The underlying reasoning of *Rochin* rejected the notion that States may secure a conviction by any form of skulduggery so long as it does not involve physical violence. The cases in which coercive or physical infringements of the dignity and privacy of the individual were involved were not deemed "sports in our constitutional law but applications of a general principle. They are only instances of the general requirement that States in their prosecutions respect certain decencies of civilized conduct. Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.' " 342 U. S., at 173.

Since due process is not a mechanical yardstick, it does not afford mechanical answers. In applying the Due Process Clause judicial judgment is involved in an empiric process in the sense that results are not pre-determined or mechanically ascertainable. But that is a very different thing from conceiving the results as *ad hoc* decisions in the opprobrious sense of *ad hoc*. Empiricism implies judgment upon variant situations by the wisdom of experience. *Ad hoc*ness in adjudication means treating a particular case by itself and not in relation to the meaning of a course of decisions and the guides they serve for the future. There is all the difference in the world between disposing of a case as though it were a discrete instance and recognizing it as part of the process of judgment, taking its place in relation to what went before and further cutting a channel for what is to come.

The effort to imprison due process within tidy categories misconceives its nature and is a futile endeavor to save the judicial function from the pains of judicial judgment. It is pertinent to recall how the Court dealt with this craving for unattainable certainty in the *Rochin* case:

> "The vague contours of the Due Process Clause do not leave judges at large. We may not draw on our merely personal and private notions and disregard the limits that bind judges in their judicial function. Even though the concept of due process of law is not final and fixed, these limits are derived from considerations that are fused in the whole nature of our judicial process. See Cardozo, The Nature of the Judicial Process; The Growth of the Law; The Paradoxes of Legal Science. These are considerations deeply rooted in reason and in the compelling traditions of the legal profession. The Due Process Clause places upon this Court the duty of exercising

a judgment, within the narrow confines of judicial power in reviewing State convictions, upon interests of society pushing in opposite directions." 342 U. S., at 170–171.

Nor can we dispose of this case by satisfying ourselves that the defendant's guilt was proven by trustworthy evidence and then finding, or devising, other means whereby the police may be discouraged from using illegal methods to acquire such evidence.

This Court has rejected the notion that because a conviction is established on incontestable proof of guilt it may stand, no matter how the proof was secured. Observance of due process has to do not with questions of guilt or innocence but the mode by which guilt is ascertained. Mere errors of law in the conduct of State trials afford no basis for relief under the Fourteenth Amendment, and a wide swath of discretion must be left to the State Courts in such matters. But when a conviction is secured by methods which offend elementary standards of justice, the victim of such methods may invoke the protection of the Fourteenth Amendment because that Amendment guarantees him a trial fundamentally fair in the sense in which that idea is incorporated in due process. If, as in *Rochin,* "[o]n the facts of this case the conviction of the petitioner has been obtained by methods that offend the Due Process Clause," 342 U. S., at 174, it is no answer to say that the offending policemen and prosecutors who utilize outrageous methods should be punished for their misconduct.[1]

---

[1] That the prosecution in this case, with the sanction of the courts, flouted a legislatively declared philosophy against such miscreant conduct and made it a policy merely on paper, does not make the conduct any the less a disregard of due process. Cf. *Rochin* v. *California, supra,* at 167.

Of course it is a loss to the community when a conviction is overturned because the indefensible means by which it was obtained cannot be squared with the commands of due process. A new trial is necessitated, and by reason of the exclusion of evidence derived from the unfair aspects of the prior prosecution a guilty defendant may escape. But the people can avoid such miscarriages of justice. A sturdy, self-respecting democratic community should not put up with lawless police and prosecutors. "Our people may tolerate many mistakes of both intent and performance, but, with unerring instinct, they know that when any person is intentionally deprived of his constitutional rights those responsible have committed no ordinary offense. A crime of this nature, if subtly encouraged by failure to condemn and punish, certainly leads down the road to totalitarianism." [2]

MR. JUSTICE DOUGLAS, dissenting.

The search and seizure conducted in this case smack of the police state, not the free America the Bill of Rights envisaged.

The police and their agents first made a key to the home of a suspect. Then they bored a hole in the roof of his house. Using the key they entered the house, installed a microphone, and attached it to a wire which ran through the hole in the roof to a nearby garage where officers listened in relays. Twice more they used the key to enter the house in order to adjust the microphone. First they moved it into the bedroom where the suspect and his wife slept. Next, they put the microphone into the bedroom closet. Then they used the key to enter the

---

[2] Statement by Director J. Edgar Hoover of the Federal Bureau of Investigation in FBI Law Enforcement Bulletin, September 1952, p. 1.

house to arrest the suspect. They had no search warrant; but they ransacked the house. Moreover, they examined the suspect's hands under an ultraviolet lamp to see if he had handled betting slips which they had earlier impregnated with fluorescent powder.

The evidence so obtained was used by California to send the suspect, petitioner here, to prison.

What transpired here was as revolting as the abuses arising out of the writs of assistance against which James Otis complained. Otis in his speech against the writs [1] had this to say:

"Now one of the most essential branches of English liberty is the freedom of one's house. A man's house is his castle; and whilst he is quiet, he is as well guarded as a prince in his castle. This writ, if it should be declared legal, would totally annihilate this privilege. Custom-house officers may enter our houses when they please; we are commanded to permit their entry. Their menial servants may enter, may break locks, bars, and every thing in their way: and whether they break through malice or revenge, no man, no court, can inquire. Bare suspicion without oath is sufficient."

In those days courts put their sanction behind the unlawful invasion of privacy by issuing the general warrant that permitted unlimited searches. There is no essential difference between that and the action we take today. Today we throw the weight of the Government on the side of the lawless search by affirming a conviction based on evidence obtained by it. Today we compound the grievance against which Otis complained. Not only is privacy invaded. The lawless invasion is officially approved as the means of sending a man to prison.

---

[1] Tudor, Life of James Otis (1823), pp. 66–67.

I protest against this use of *unconstitutional* evidence. It is no answer that the man is doubtless guilty. The Bill of Rights was designed to protect every accused against practices of the police which history showed were oppressive of liberty. The guarantee against unreasonable searches and seizures contained in the Fourth Amendment was one of those safeguards. In 1914 a unanimous Court decided that officers who obtained evidence in violation of that guarantee could not use it in prosecutions in the federal courts. *Weeks* v. *United States,* 232 U. S. 383. Lawless action of the federal police, it said, "should find no sanction in the judgments of the courts . . . ." *Id.,* p. 392.

The departure from that principle which the Court made in 1949 in *Wolf* v. *Colorado,* 338 U. S. 25, is part of the deterioration which civil liberties have suffered in recent years. In that case the Court held that evidence obtained in violation of the Fourth Amendment, though inadmissible in federal prosecutions, could be used in prosecutions in the state courts. Mr. Justice Murphy, dissenting, pointed out the peril of that step, *id.,* p. 44:

"The conclusion is inescapable that but one remedy exists to deter violations of the search and seizure clause. That is the rule which excludes illegally obtained evidence. Only by exclusion can we impress upon the zealous prosecutor that violation of the Constitution will do him no good. And only when that point is driven home can the prosecutor be expected to emphasize the importance of observing constitutional demands in his instructions to the police."

Exclusion of evidence is indeed the only effective sanction. If the evidence can be used, no matter how lawless the search, the protection of the Fourth Amendment, to use the words of the Court in the *Weeks* case, "might as

well be stricken from the Constitution." 232 U. S., at 393.

The suggestion that the remedy for lawless conduct by the local police is through federal prosecution under the civil rights laws relegates constitutional rights under the Fourth Amendment to a lowly status. An already overburdened Department of Justice, busily engaged in law enforcement, cannot be expected to devote its energies to supervising local police activities and prosecuting police officers, except in rare and occasional instances.[2] And the hostility which such prosecutions have received here (see *Screws* v. *United States,* 325 U. S. 91, especially pp. 138 *et seq.*) hardly encourages putting the federal prosecutor on the track of state officials who take *unconstitutional* short cuts in enforcing state laws.[3]

If unreasonable searches and seizures that violate the privacy which the Fourth Amendment protects are to be outlawed, this is the time and the occasion to do it. If police officers know that evidence obtained by their unlawful acts cannot be used in the courts, they will clean their own houses and put an end to this kind of action. But as long as courts will receive the evidence, the police will act lawlessly and the rights of the individual will suffer. We should throw our weight on the side of the citizen and against the lawless police. We should be alert to see that no *unconstitutional* evidence is used to convict any person in America.

---

[2] For an analysis of the civil rights suits instituted by the Department of Justice, see the Appendix to this opinion.

[3] The current hostility towards federal actions—both criminal and civil—under the civil rights laws is further evidenced by *United States* v. *Williams,* 341 U. S. 70; *Tenney* v. *Brandhove,* 341 U. S. 367; *Collins* v. *Hardyman,* 341 U. S. 651; *Whittington* v. *Johnston,* 201 F. 2d 810, cert. denied, 346 U. S. 867; *Francis* v. *Crafts,* 203 F. 2d 809, cert. denied, 346 U. S. 835.

## APPENDIX TO OPINION OF
## MR. JUSTICE DOUGLAS.

Mr. Justice Murphy, when Attorney General, was responsible for the creation of the Civil Rights Section in the Department of Justice. That was on February 3, 1939. In 1947 Mr. Justice Clark, then Attorney General, reported that the Section had in the eight years of its existence investigated nearly 850 complaints, instituted prosecutions in 178 cases, and obtained the conviction of more than 130 defendants. Clark, A Federal Prosecutor Looks at the Civil Rights Statutes, 47 Col. L. Rev. 175, 181. See also Report of the President's Committee on Civil Rights: To Secure These Rights (1947), pp. 114 *et seq.*

A more recent account of the work of the Civil Rights Section will be found in Putzel, Federal Civil Rights Enforcement: A Current Appraisal, 99 U. of Pa. L. Rev. 439 (1951). It is there stated that on the average 20 civil rights cases are prosecuted a year, acquittals and convictions being about equally divided. *Id.*, p. 449, n. 43. These figures are confirmed by the Administrative Office of the United States Courts. Records available in that office show the following number of civil rights prosecutions filed in the district courts in the years since 1947:

| Fiscal year | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 |
|---|---|---|---|---|---|---|---|
| Total cases....... | 10 | 13 | 22 | 18· | 16 | 15 | 29 |
| Total defendants.. | 26 | 53 | 66 | 72 | 69 | 49 | 92 |

More detailed figures are available for the past three fiscal years. The following table shows the number of defendants who actually went to trial, the disposition of

their cases, and the sentences imposed on those who were convicted:

| Fiscal year | 1951 | 1952 | 1953 |
|---|---|---|---|
| Total defendants..................... | 22 | 50 | 54 |
| Not convicted: Total................ | 11 | 20 | 45 |
| Dismissed ...................... | 4 | 2 | 18 |
| Acquitted by court.............. | ........ | ........ | 1 |
| Acquitted by jury............... | 7 | 18 | 26 |
| Convicted: Total.................... | 11 | 30 | 9 |
| Pleas of guilty or nolo contendere.. | 3 | 21 | 1 |
| Convicted by court.............. | ........ | 5 | |
| Convicted by jury............... | 8 | 4 | 8 |
| Type of sentence: Imprisonment total.. | 7 | 4 | 8 |
| 1–6 months...................... | ........ | ........ | 1 |
| 6 months to 1 year, 1 day........ | 7 | ........ | 7 |
| More than 1 year, 1 day........... | ........ | 4 | |
| Type of sentence: Probation and suspended sentence.................... | 2 | 20 | |
| Type of sentence: Fine only.......... | 2 | 6 | 1 |
| Average sentence of imprisonment (months) ........................ | 10.9 | 16.5 | 9.4 |

*Note:* These figures from the Administrative Office include all prosecutions filed and conducted under all of the Sections of the Criminal Code which are usually called Civil Rights Sections, that is, 18 U. S. C. §§ 241–244. Use of §§ 243 and 244, however, has been very rare, so that most of the figures quoted involve prosecutions under either § 241 or § 242. The figures set out in the second table do not take into account such appellate reversals as may have been entered, and they include only those post-judgment motions in the district court which were disposed of before the end of the fiscal year in question.

The Code provisions in question read as follows:

"§ 241. *Conspiracy against rights of citizens.*

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

"They shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

"§ 242. *Deprivation of rights under color of law.*

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"§ 243. *Exclusion of jurors on account of race or color.*

"No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged

with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000.

"§ 244. *Discrimination against person wearing uniform of armed forces.*

"Whoever, being a proprietor, manager, or employee of a theater or other public place of entertainment or amusement in the District of Columbia, or in any Territory, or Possession of the United States, causes any person wearing the uniform of any of the armed forces of the United States to be discriminated against because of that uniform, shall be fined not more than $500."