Mr. Chief Justice Burger,
dissenting.
I dissent from today’s holding which judicially creates a damage remedy not provided for by the Constitution and not enacted by Congress. We would more surely preserve the important values of the doctrine of separa *412 tion of powers — and perhaps get a better result — by recommending a solution to the Congress as the branch of government in which the Constitution has vested the legislative power. Legislation is the business of the Congress, and it has the facilities and competence for that task — as we do not. Professor Thayer, speaking of the limits on judicial power, albeit in another context, had this to say:[1]
“And if it be true that the holders of legislative power are careless or evil, yet the constitutional duty of the court remains untouched; it cannot rightly attempt to protect the people, by undertaking a function not its own. On the other hand, by adhering rigidly to its own duty, the court will help, as nothing else can, to fix the spot where responsibility lies, and to bring down on that precise locality the thunderbolt of popular condemnation. . . . For that course — the true course of 'judicial duty always — will powerfully help to bring the people and their representatives to a sense of their own responsibility.”
This case has significance far beyond its facts and its holding. For more than 55 years this Court has enforced a rule under which evidence of undoubted reliability and probative value has been suppressed and excluded from criminal cases whenever it was obtained in violation of the Fourth Amendment. Weeks v. United States, 232 U. S. 383 (1914); Boyd v. United States, 116 U. S. 616, 633 (1886) (dictum). This rule was extended to the States in Mapp v. Ohio, 367 U. S. 643 (1961).[2] *413 The rule has rested on a theory that suppression of evidence in these circumstances was imperative to deter law enforcement authorities from using improper methods to obtain evidence.
The deterrence theory underlying the suppression doctrine, or exclusionary rule, has a certain appeal in spite of the high price society pays for such a drastic remedy. Notwithstanding its plausibility, many judges and lawyers and some of our most distinguished legal scholars have never quite been able to escape the force of Cardozo’s statement of the doctrine’s anomalous result:
“The criminal is to go free because the constable has blundered. ... A room is searched against the law, and the body of a murdered man is found. . . . The privacy of the home has been infringed, and the murderer goes free.” People v. Defore, 242 N. Y. 13, 21, 23-24, 150 N. E. 585, 587, 588 (1926).[3]
The plurality opinion in Irvine v. California, 347 U. S. 128, 136 (1954), catalogued the doctrine’s defects:
“Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy against one lawbreaker because he has been pursued by ■ another. It protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches.”
From time to time members of the Court, recognizing the validity of these protests, have articulated varying *414 alternative justifications for the suppression of important evidence in a criminal trial. Under one of these alternative theories the rule’s foundation is shifted to the “sporting contest” thesis that the government must “play the game fairly” and cannot be allowed to profit from its own illegal acts. Olmstead v. United States, 277 U. S. 438, 469, 471 (1928) (dissenting opinions); see Terry v. Ohio, 392 U. S. 1, 13 (1968). But the exclusionary rule does not ineluctably flow from a desire to ensure that government plays the “game” according to the rules. If an effective alternative remedy is available, concern for official observance of the law does not require adherence to the exclusionary rule. Nor is it easy to understand how a court can be thought to endorse a violation of the Fourth Amendment by allowing illegally seized evidence to be introduced against a defendant if an effective remedy is provided against the government.
The exclusionary rule has also been justified on the theory that the relationship between the Self-Incrimination Clause of the Fifth Amendment and the Fourth Amendment requires the suppression of evidence seized in violation of the latter. Boyd v. United States, supra, at 633 (dictum); Wolf v. Colorado, 338 U. S. 25, 47, 48 (1949) (Rutledge, J., dissenting); Mapp v. Ohio, supra, at 661-666 (Black, J., concurring).
Even ignoring, however, the decisions of this Court that have held 'that the Fifth Amendment applies only to “testimonial” disclosures, United States v. Wade, 388 U. S. 218, 221-223 (1967); Schmerber v. California, 384 U. S. 757, 764 and n. 8 (1966), it seems clear that the Self-Incrimination Clause does not protect a pérson from the seizure of evidence that is incriminating. It protects a person only from being the conduit by which the police acquire evidence. Mr. Justice Holmes once put it succinctly, “A party is privileged from producing the *415 evidence but not from its production.” Johnson v. United States, 228 U. S. 457, 458 (1913).
It is clear, however, that neither of these theories under-girds the decided cases in this Court. Rather the exclusionary rule has rested on the deterrent rationale — the hope that law enforcement officials would be deterred from unlawful searches and seizures if the illegally seized, albeit trustworthy, evidence was suppressed often enough and the courts persistently enough deprived them of any benefits they might have gained from their illegal conduct.
This evidentiary rule is unique to American jurisprudence. Although the English and Canadian legal systems are highly regarded, neither has adopted our rule. See Martin, The Exclusionary Rule Under Foreign Law— Canada, 52 J. Crim. L. C. & P. S. 271, 272 (1961); Williams, The Exclusionary Rule Under Foreign Law— England, 52 J. Crim. L. C. & P. S. 272 (1961).
I do not question the need for some remedy to give meaning and teeth to the constitutional guarantees against unlawful conduct by government officials. Without some effective sanction, these protections would constitute little more than rhetoric. Beyond doubt the conduct of some officials requires sanctions as cases like Irvine indicate. But the hope that this objective could be accomplished by the exclusion. of reliable evidence from criminal trials was hardly more than a wistful dream. Although I would hesitate to abandon it until some meaningful substitute is developed, the history of the suppression doctrine demonstrates that it is both conceptually sterile and practically ineffective in accomplishing its stated objective. This is illustrated by the paradox that an unlawful act against a totally innocent, person — such as petitioner claims to be — has been left, without an effective remedy, and hence the Court finds *416 it necessary now — 55 years later — to construct a remedy of its own.
Some clear demonstration of the benefits and effectiveness of the exclusionary rule is required to justify it in view of. the high price it extracts from society — the release of countless guilty criminals. See Allen, Federalism and the Fourth Amendment: A Requiem for Wolf, 1961 Sup. Ct. Rev. 1, 33 n. 172. But there is no empirical evidence to support the claim that the rule actually deters illegal conduct of law enforcement officials. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 667 (1970).
There are several reasons for this failure. The rule does not apply any direct sanction to the individual official whose illegal conduct results in the exclusion of evidence in a criminal trial. With rare exceptions law enforcement agencies do not impose direct sanctions on the individual officer responsible for a particular judicial application of thé suppression doctrine. Id., at 710. Thus there is virtually nothing done to bring about a change in his practices. The immediate sanction triggered by the application of the rule is visited upon the prosecutor whose case against a criminal is either weakened or destroyed. The doctrine deprives the police in no real sense; except that apprehending wrongdoers is their business, police have no more stake in successful prosecutions than prosecutors or the public.
The suppression doctrine vaguely assumes that law enforcement is a monolithic governmental enterprise. For exainple, the dissenters in Wolf v. Colorado, supra, at 44, argued that:
“Only by exclusion can we impress upon the zealous prosecutor that violation of the Constitution will do him no good. And only when that point is driven' home can the prosecutor be expected to emphasize *417 the importance of observing the constitutional demands in his instructions to the police(Emphasis added.)
But the prosecutor who loses his case because of police misconduct is not an official in the police department; he can rarely set in motion any corrective action or administrative penalties. Moreover, he does not have control or direction over police procedures or police actions that lead to the exclusion of evidence. It is the rare exception when a prosecutor takes part in arrests, searches, or seizures so that he can guide police action.
Whatever educational effect the rule conceivably might have in theory is greatly diminished in fact by' the realities of law enforcement work. Policemen do not have the time, inclination, or training to read and grasp the nuances of the appellate opinions that ultimately define the standards of conduct they are to follow. The issues that these decisions resolve often admit of neither easy nor obvious answers, as sharply divided courts on what is or is not “reasonable” amply demonstrate;[4] Nor can judges, in all candor, forget that opinions sometimes lack helpful clarity.
The presumed educational effect of judicial opinions is also reduced by the long time lapse — often several years— between the original police action and its final judicial evaluation. Given a policeman’s pressing responsibilities, it would be surprising if he ever becomes aware of the final result after such a delay. Finally, the exclu *418 sionary rule’s deterrent impact is diluted by the fact that there are large areas of police activity that do not result in criminal prosecutions — hence the rule has virtually no applicability and no effect in such situations. Oaks, supra, at 720-724.
Today’s holding seeks to fill one of the gaps of the suppression doctrine — at the price of impinging on the legislative and policy functions that the Constitution vests in Congress. Nevertheless, the holding serves the useful purpose of exposing the fundamental weaknesses of the suppression doctrine. Suppressing unchallenged truth has set guilty criminals free but demonstrably has neither deterred deliberate violations of the Fourth Amendment nor decreased those errors in judgment that will inevitably occur given the pressures inherent in police work having to do with serious crimes.
Although unfortunately ineffective, the exclusionary rule has increasingly been characterized by a single, monolithic, and drastic judicial response to all official violations of legal norms. Inadvertent errors of judgment that do not work any grave injustice will inevitably occur under the pressure of police work. These honest mistakes have been treated in the same way as deliberate and flagrant Irvine-type violations of the Fourth Amendment. For example, in Miller v. United States, 357 U. S. 301, 309-310 (1958), reliable evidence was suppressed because of a police officer’s failure to say a “few more words” during the arrest and search of a known narcotics peddler.
This Court’s decision announced today in Coolidge v. New Hampshire, post, p. 443, dramatically illustrates the extent to which the doctrine represents a mechanically inflexible response to widely varying degrees of police error and the resulting high price that society pays. I dissented in Coolidge primarily because I do not believe the Fourth Amendment had been violated. Even on the Court’s contrary premise, however, whatever violation *419 occurred was surely insufficient in nature and extent to justify the drastic result dictated by the suppression doctrine. A fair trial by jury has resolved doubts as to Coolidge’s guilt. But now his conviction on retrial is placed in serious question by the remand for a new trial — years after the crime — in which evidence that the New Hampshire courts found relevant and reliable will be withheld from the jury’s consideration. It is hardly surprising that such results are viewed with incomprehension by nonlawyers in this country and lawyers, judges, and legal scholars the world over.
Freeing either a tiger or a mouse in a schoolroom is an illegal act, but no rational person would suggest that the^e two acts should be punished in the same way. From time to time judges have occasion to pass on regulations governing police procedures. I wonder what would be the judicial response to a police order authorizing “shoot to kill” with respect to every fugitive. It is easy to predict our collective wrath and outrage. We, in common with all rational minds, would say that the police response must relate to the gravity and need; that a “shoot” order might conceivably be tolerable to prevent the escapé of a convicted killer but surely not for a car thief, a pickpocket or a shoplifter.
I submit that society has at' least as much right to expect rationally graded responses from judges in place of the universal “capital punishment” we inflict on all evidence when police error is shown in its acquisition. See ALI, Model Code of Pre-Arraignment Procedure § SS 8.02 (2), p. 23 (Tent. Draft No. 4, 1971), reprinted in the Appendix to this opinion. Yet for over 55 years, and with increasing scope and intensity as today’s Coolidge holding shows, our legal system has treated vastly dissimilar cases as if they were the same. Our adherence to the exclusionary rule, our resistance to change, and our refusal even to acknowledge the need *420 for effective enforcement mechanisms bring to mind Holmes’ well-known statement:
“It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.” Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897).
In characterizing the suppression doctrine as an anomalous and ineffective mechanism with which to regulate law enforcement, I intend no reflection on the motivation of those members of this Court who hoped it would be a means of enforcing the Fourth Amendment. Judges cannot be faulted for being offended by arrests, searches, and seizures that violate the Bill of Rights or statutes intended to regulate public officials. But we can and should be faulted for clinging to an unworkable and irrational concept of law. My criticism is that we have taken so long to find better ways to accomplish these desired objectives. And there are better ways.
Instead of continuing to enforce the suppression doctrine inflexibly, rigidly, and mechanically, we should view it as one of the experimental steps in the great tradition of the common law and acknowledge its shortcomings. But in the same spirit we should be prepared to discontinue what the experience of over half a century has shown neither deters errant officers nor affords a remedy to the totally innocent victims of official misconduct.
I do not propose, however, that we abandon the suppression doctrine until some meaningful alternative can be developed. In a sense our legal system has become the captive of its own creation. To overrule Weeks and Mapp, even assuming the Court was now prepared to *421 take that step, could raise yet new problems. Obviously the public interest would be poorly served if law enforcement officials were suddenly to gain the impression, however erroneous, that all constitutional restraints on police had somehow been removed — that an open season on “criminals” had been declared. I am concerned lest some such mistaken impression might be fostered by a flat overruling of the suppression doctrine cases. For years we have relied upon it as the exclusive remedy for unlawful official conduct; in a sense we are in a situation akin to the narcotics addict whose dependence on drugs precludes any drastic or immediate withdrawal of the supposed prop, regardless of how futile its continued use may be.
Reasonable and effective substitutes can be formulated if Congress would take the lead, as it did for example in 1946 in the Federal Tort Claims Act. I see'no insuperable obstacle to the elimination of the suppression doctrine if Congress would provide some meaningful and effective remedy against unlawful conduct by government officials.
The problems of both error and deliberate misconduct by law enforcement officials call for a workable remedy. Private damage actions against individual police officers concededly have not adequately met this requirement, and it would be fallacious to assume today’s work of the Court in creating a remedy will really accomplish its stated objective. There is some validity to the claims that juries will not return verdicts .against individual officers except in those unusual cases where the violation has been flagrant or where the error has been complete, as in the arrest of the wrong person or the search of the wrong house. There is surely serious doubt, for example, that a drug peddler caught packaging his wares will be able to arouse much sympathy in a jury on the ground that the police officer did not announce his identity and *422 purpose fully; or because he failed to utter a “few more words.” See Miller v. United States, supra. Jurors may well refuse to penalize a police officer at the behest of a person they believe to be a “criminal” and probably will not punish an officer for honest errors of judgment. In any event an actual recovery depends on finding nonexempt assets of the police officer from which a judgment can be satisfied.
I conclude, therefore, that an entirely different remedy is necessary but it is one that in my view is as much beyond judicial power as the step the Court takes today. Congress should develop an administrative or quasi-judicial remedy against the government itself to afford compensation and restitution for persons whose Fourth Amendment rights have been violated. The venerable doctrine of respondeat superior in our tort law provides an entirely appropriate conceptual basis for this remedy. If, for example, a security guard privately employed by a department store commits an assault or other tort on a customer such as an improper search, the victim has a simple and obvious remedy — an action for money damages against the guard’s employer, the department store. W. Prosser, The Law of Torts § 68, pp. 470-480 (3d ed. 1964).[5] Such a statutory scheme would have the added advantage of providing some remedy to the completely innocent persons who are sometimes the victims of illegal police conduct — something that the suppression doctrine, of course, can never accomplish.
. A simple structure would suffice.[6] For example, Congress could enact a statute along the following lines:
(a) a waiver of sovereign immunity as to the illegal *423 acts of law enforcement officials committed in the performance of assigned duties;
(b) the creation of a cause of action for damages sustainéd by any person aggrieved by conduct of governmental agents in violation of the Fourth Amendment or statutes regulating official condúce-
te) the creation of a tribunal, quasi-judicial in nature or perhaps patterned after the United States Court of Claims, to adjudicate all claims under the statute;
(d) a provision that this statutory remedy is in lieu of the exclusion of evidence secured fór use in criminal cases in violation of the Fourth Amendment; and
(e) a provision directing that no evidence, otherwise admissible, shall be excluded from any criminal proceeding because of violation of the Fourth Amendment.
I doubt that lawyers serving on such a tribunal would be swayed either by undue sympathy for officers or by the prejudice against “criminals” that has sometimes moved lay jurors to deny claims. In addition to awarding damages, the record of the police conduct that is condemned would undoubtedly become a relevant part of an officer’s personnel file so that the need for additional training or disciplinary action could be identified or his future usefulness as a public official evaluated. Finally, appellate judicial review could be made available on much the same basis that it is now provided as to district courts and regulatory agencies. This would' leave to the courts the ultimate responsibility for determining and articulating standards.
Once the constitutional validity of such a statute is established,[7] it can reasonably be assumed that the States *424 would develop their own remedial systems on the federal model. Indeed there is nothing to prevent a State from enacting a comparable statutory scheme without waiting for the Congress. Steps along these lines would move our system toward more responsible law enforcement on the one hand and away from the irrational and drastic results of the suppression doctrine on the other. Independent of the alternative embraced in this dissenting opinion, I believe the time has come to re-examine the scope of the exclusionary rule and consider at least some narrowing of its thrust so as to eliminate the anomalies it has produced.
In a country that prides itself on innovation, inventive genius, and willingness to experiment, it is a paradox that we should cling for more than a half century to a legal mechanism that was poorly designed and never really worked. I can only hope now that the Congress will manifest a willingness to view realistically the hard evidence of the half-century history of the suppression doctrine revealing thousands of cases in which the criminal was set free because the constable blundered and virtually no evidence that innocent victims of police error— such as petitioner claims to be — have been afforded meaningful redress.
APPENDIX TO OPINION OF BURGER, C. J., DISSENTING
It is interesting to note that studies over a period of years led the American Law Institute to propose the following in its tentative draft of a model pre-arraignment code:
“(2) Determination. Unless otherwise required by the Constitution of the United Stated or of this State, a motion to suppress evidence based upon a *425 violation of any of the provisions of this code shall be granted only if the court -finds that such violation was substantial. In determining whether a violation is substantial the court shall consider all the circumstances, including:
“(a) the importance of the particular interest violated;
“(b) the extent of deviation from lawful conduct;
“(c) the extent to which the violation was willful;
“(d) the extent to which privacy was invaded;
“(e) the extent to which exclusion will tend to prevent violations of this Code;
“(f) whether, but for the violation, the things seized would have been discovered; and
“(g) the extent to which the violation prejudiced the moving party’s ability to support his motion, or to defend himself in the proceeding in- which the things seized are sought to be offered in evidence against him.
“(3) Fruits of Prior Unlawful Search. If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to a motion to suppress under subsection (1), and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes that such evidence would probably have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of this Code.”
ALI, Model Code of Pre-Arraignment Procedure §§ SS 8.02 (2), (3), pp. 23-24 (Tent. Draft No. 4, 1971) (emphasis supplied).
*426 The Reporters’ views on the exclusionary rule are also reflected in their comment on the proposed section:
“The Reporters wish to emphasize that they are not, as a matter of policy, wedded to the exclusionary rule as the sole or best means of enforcing the Fourth Amendment. See Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. of Chi. L. Rev. 665 (1970). Paragraph (2) embodies what the Reporters hope is a more flexible approach to the problem, subject of course to constitutional requirements.” Id., comment, at 26-27.
This is but one of many expressions of disenchantment with the exclusionary rule; see also:
1. Barrett, Exclusion of Evidence Obtained by Illegal Searches — A Comment on People vs. Cahan, 43 Calif. L. Rev. 565 (1955).
2. Burns, Mapp v. Ohio: An All-American Mistake, 19 DePaul L. Rev. 80 (1969).
3. Friendly, The Bill of Rights ás a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 951-954 (1965).
4. F. Inbau, J. Thompson, & C. Sowle, Cases and Comments on Criminal Justice: Criminal Law Administration 1-84 (3d ed. 1968).
5. LaFave, Improving Police Performance Through the Exclusionary Rule (pts. 1 & 2), 30 Mo. L. Rev. 391, 566 (1965).
6. LaFave & Remington, Controlling the Police: The Judge’s Role in Making and Reviewing Law Enforcement Decisions, 63 Mich. L. Rev. 987 (1965).
7. N. Morris & G. Hawkins, The Honest Politician’s Guide to Crime Control 101 (1970).
8. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665 (1970).
*427 9. Plumb, Illegal Enforcement of the Law; 24 Cornell L. Q. 337 (1939).
10. Schaefer, The Fourteenth Amendment and Sanctity of the Person, 64 Nw. U. L. Rev. 1 (1969).
11. Waite, Judges and the Crime Burden, 54 Mich. L. Rev. 169 (1955).
12. Waite, Evidence — Police Regulation by Rules of Evidence, 42 Mich. L. Rev. 679 (1944)'.
13. Wigmore, Using Evidence Obtained by Illegal Search and Seizure, 8 A. B. A. J. 479 (1922).
14. 8 J. Wigmore, Evidence § 2184a (McNaughton rev. 1961).

 J. Thayer, O. Holmes, & F. Frankfurter, John Marshall 88 (Phoenix ed. 1967).

 The Court reached the issue of applying the Weeks doctrine to the States sua sponte.

 What Cardozo suggested as an example of the potentially far-reaching consequences of the suppression doctrine was almost realized in Killough v. United States, 114 U. S. App. D. C. 305, 315 F. 2d 241 (1962).

 For example, in a case arising under Mapp, supra, state judges at every level of the state judiciary may find the police conduct proper. On federal habeas corpus a district judge and a court of appeals might agree. Yet, in these circumstances, this Court, reviewing the case as much as 10 years later, might reverse by a narrow margin. In these circumstances it is difficult to conclude that the policeman has violated some rule that he should have known was a restriction on his authority.

 Damage verdicts for such acts are often sufficient in size to provide an effective deterrent and stimulate employers to corrective action.

 Electronic eavesdropping presents special problems. See 18 U. S. C. §§ 2510-2520 (1964 ed., Supp. V).

 Any such legislation should emphasize the interdependence between the waiver of sovereign'immunity and the elimination of the judicially created exclusionary rule so that if the legislative determination to repudiate the exclusionary rule falls, the entire statutory scheme would fall.