UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald SANTORA, Earl Rardin, Maurice Eugene Lickteig, Theresa Sohn, Garth Jon Brian Upton, Roy Cohn, Mary Evans, and Walter P. Moore, Defendants-Appellants.

Nos. 76–3440, 76–3446, 76–3485, 76–3521, 76–3525, 76–3567, 76–3711 and 77–2626.

United States Court of Appeals, Ninth Circuit.

Oct. 6, 1978.

Rehearing and Rehearing En Banc Denied Jan. 11, 1979.

Howard W. Gillingham (argued), Joe Reichmann (argued), Los Angeles, Cal., Gordon J. Rose (argued), Beverly Hills, Cal., Jonathan M. Yost (argued), Santa Monica, Cal., S. G. Jackson (argued), Kenneth L. Collins (argued), Los Angeles, Cal., James Edward Morgan (argued), Beverly Hills, Cal., for defendants-appellants.

Ronald W. Rose (argued), Los Angeles, Cal., for plaintiff-appellee.

Before HUFSTEDLER and ANDERSON, Circuit Judges, and KING,* District Judge.

HUFSTEDLER, Circuit Judge:

These consolidated appeals raise a series of issues relating to the validity, the interpretation and effect of four court orders authorizing FBI agents to wiretap several telephones and to permit FBI agents to break into a business premise for the purpose of installing, servicing, and removing an electronic listening device. With trivial exceptions, the Government's cases rested upon evidence that was the product of electronic surveillance conducted pursuant to court orders. Each of the appellants filed motions to suppress evidence gathered by electronic surveillance and the fruit of the intercepted conversations. These consolidated appeals present a number of issues common to all appellants, and others that relate to each individually.

The appeals arise from two separate indictments. One indictment charged 16 persons with various offenses involving traffic in stolen airline tickets. Santora, Evans, Lickteig, and Moore appeal from their convictions on various counts of the indictment charging stolen airline ticket offenses. The second indictment charged 11 persons with offenses involving traffic in controlled substances. Rardin, Cohn, Upton, and Sohn appeal from their convictions on various counts of the narcotics indictment.

## I. THE INTERCEPTION ORDERS

Four court interception orders are involved in this appeal. The first, interception Order No. 4651, was issued by the district court on April 1, 1975. It authorized FBI agents to conduct electronic surveillance, by means of a bug and two wiretaps, at the AAA Appliance Company, a small vacuum cleaner and sewing machine sales and service business located in Inglewood, California. More specifically, the district court order authorized special agents of the FBI: "to enter the premises known as the office of Ronald Santora, at AAA Appliance Company, . . . without permission of the owners, occupants, or lessees thereof and to install, maintain, and subsequently remove from said premises equipment for the interception of oral communications; and to intercept oral communications taking place within said office or within range of said equipment and to intercept wire communications to and from the above-described telephones . . .." The two telephone taps authorized by this order were instituted on April 2, 1975. Federal agents broke into AAA at nighttime on April 3, 1975, and installed a bug within the premises.

Based on information obtained through both the bug and the wiretaps, the Government applied for another court order extending the period of permissible use of the devices. On May 12, 1975, the district court issued Order No. 4719, which extended the period of authorized surveillance for an additional 20 days. The extension order repeated the terms of the initial intercept order (including its entry provision) almost verbatim.

Two other interception orders were obtained by the Government. On April 21, 1975, the district court approved interception Order No. 4676, which authorized the tapping of a coin-operated public telephone located outside the premises of the AAA

* Honorable Samuel P. King, Chief Judge, United States District Court, District of Hawaii, sitting by designation.

Appliance Company. The Government's application for this order cited incriminating conversations overheard by the wiretaps on the company's telephones, as well as visual observations of the suspected conspirators using the public phone outside the company. No information obtained through use of the bug was used to obtain the new interception order.

Interception Order No. 4700, issued on May 2, 1975, authorized wiretaps on five additional telephones. The Government's probable cause affidavit used to obtain this order included information obtained from the wiretaps on the company telephones, the bug in the company office, and the tap on the public phone. To support the claim that wiretapping was necessary, the Government relied primarily on prior statements made in the application for the initial interception order. However, none of the persons whose telephones were tapped pursuant to Order No. 4700 had been named in the initial interception application.

## II. THE ISSUES DECIDED

These appeals raise three principal issues. First, we must consider a series of challenges to the validity of the initial intercept order as a whole. Second, we must decide a question of first impression in this Circuit: Does Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.,* permit courts to authorize break-ins for the purpose of planting bugging devices? Third, we must determine whether a prior showing of the inadequacy of investigative alternatives is sufficient to support authority to tap phones of additional persons not named in the previous intercept application.

For reasons outlined below, we hold that the initial interception order was valid insofar as it authorized wiretapping of the AAA Appliance Company's telephones. But because we hold that Title III does not empower courts to authorize break-ins, the break-in and bugging of the company was invalid, and all evidentiary fruits of this bug are tainted. Thus evidence obtained pursuant to intercept Order No. 4719 (re-newal of initial wiretaps) and No. 4700 (tapping of five additional private phones) must be suppressed as to those defendants with standing to object to its use. Furthermore, because we conclude that the Government's showing of the inadequacy of alternative techniques is insufficient to support Order No. 4700, evidence obtained pursuant to this order is subject to suppression on an additional ground.

We first discuss the legal challenges to the electronic surveillance orders, and thereafter we undertake an examination of the contentions of the individual appellants which are not resolved by our disposition of the electronic surveillance orders.

## III. CHALLENGES TO THE INITIAL INTERCEPTION ORDER AS A WHOLE

■ The initial interception order (No. 4651), which permitted bugging of the appliance company and tapping of two company phones, is challenged in its entirety on three grounds. First, it is argued that the application for the order was defective because the Government did not produce evidence showing that the Attorney General personally reviewed the facts prior to signing the authorization. This contention need not long detain us. We have heretofore rejected the contention that an Attorney General's authorization for a wiretap is defective in absence of a showing that the Attorney General reached his decision to authorize a wiretap only after evaluation of the factual foundation for the recommendation upon which he relies. (*United States v. Feldman* (9th Cir. 1976) 535 F.2d 1175; *United States v. Turner* (9th Cir. 1975) 528 F.2d 143.)

■ Second, appellants argue that the Government's initial application failed to make a particularized showing of the improbability of success or a high degree of danger from the use of alternative investigative techniques, as required by 18 U.S.C. § 2518(1)(c). This contention also fails. The Government presented the affidavit of Agent Blair, which contained a series of

factual representations concerning the agents' efforts to use normal investigative procedures, all of which were unsuccessful. It also referred to the refusal of informants to testify or to help agents infiltrate the conspiracy for fear of retaliation. The showings in Agent Blair's affidavit cannot be successfully distinguished from the showings held adequate in such cases as *United States v. Abascal* (9th Cir. 1977) 564 F.2d 821; *United States v. Feldman, supra,* 535 F.2d 1175. (*See also United States v. Turner, supra,* 528 F.2d at 152; *United States v. Kerrigan* (9th Cir. 1975) 514 F.2d 35, 38.)

■ Finally, appellants claim that the district court erred in denying an evidentiary hearing upon the minimization issue. The order specifically required minimization in conformity with 18 U.S.C. § 2518(5). In response to appellants' suppression motions premised on an alleged failure to follow minimization requirements, the Government filed an affidavit of Agent Blair, together with charts showing the number and kinds of conversations that had been intercepted pursuant to the court order. None of the appellants specifically sought an evidentiary hearing on the minimization question. The district court found that the agents had acted in good faith and in exercise of ordinary care and judgment in trying to minimize the interceptions. The appellants have failed to cite any authority requiring the district court, *sua sponte,* to order an evidentiary hearing when an issue is raised concerning minimization. We decline to supply any. Rather, the question whether an evidentiary hearing is appropriate rests on the reasoned discretion of the district court. The district court's failure to order an evidentiary hearing on its own motion is not an abuse of discretion in this case. The logs of the intercepted conversations, together with Agent Blair's affidavit, established a *prima facie* case that adequate minimization had been undertaken in a good faith, if not completely successful, effort to limit interception. As we stated in

*United States v. Turner, supra,* 528 F.2d at 156:

"The statute does not require that *all* conversations unrelated to the criminal activity specified in the order be free from interception. Rather it requires that measures be adopted to reduce the extent of such interception to a practical minimum while allowing the legitimate aims of the Government to be pursued. [Citations omitted.] In a case where it is clear that the minimization provision of the order was disregarded by the Government throughout the period covered by the order, a total suppression might well be appropriate. We assume, *arguendo,* that such should be the rule. Here, however, the district court found reasonable and good-faith effort on the part of the Government to comply with the orders authorizing the interceptions."

(*Accord: United States v. Abascal, supra,* 564 F.2d 821; *United States v. Scully* (9th Cir. 1976) 546 F.2d 255, *vacated on other grounds,* 430 U.S. 902, 97 S.Ct. 1168, 50 L.Ed.2d 578 (1977); *United States v. Chavez* (9th Cir. 1976) 533 F.2d 491).

The conclusion follows that the district court correctly denied the appellants' motions to suppress the telephone conversations together with the evidence thereafter developed from those conversations under authority of Order No. 4651.

## IV. POWER OF COURTS TO AUTHORIZE BREAK–INS TO PLANT BUGGING DEVICES

■ We next turn to the most troublesome issue in this case: the validity of that portion of the first intercept order that purports to authorize FBI agents to break into the premises of the AAA Appliance Company for the purpose of planting a bug. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, *et seq.,* permitting, under restricted circumstances, a court order authorizing interception of oral communications, contains no provision purporting to empower district courts to authorize break-ins for the pur-

pose of installing listening devices. The statute is entirely silent on the subject.[1]

The question whether power to authorize break-ins can be implied from Title III's silence is one that has sharply divided the Circuits. The Second and Third Circuits have held that Title III implicitly authorizes break-ins without specific judicial approval. (*United States v. Scafidi* (2d Cir. 1977) 564 F.2d 633; *United States v. Dalia* (3rd Cir. 1978) 575 F.2d 1344.) The Fourth Circuit has held that Title III implicitly authorizes break-ins, but only with specific judicial approval. (*Application of United States* (4th Cir. 1977) 563 F.2d 637.) The Eighth Circuit has not accepted the argument that Title III implicitly authorizes break-ins, but it has upheld judicially-approved break-ins on a different theory. (*United States v. Agrusa* (8th Cir. 1976) 541 F.2d 690 (opinions by divided court, rehearing en banc denied over four-judge dissent).) The District of Columbia Circuit has declined to read Title III as implicit authority for break-in orders. (*United States v. Ford* (1977) 180 U.S.App.D.C. 1, 553 F.2d 146.) And the Sixth Circuit has held that no authority exits, in Title III or any other statute, to empower district courts to authorize break-ins. (*United States v. Finazzo* (6th Cir. 1978) 583 F.2d 837.) This Circuit has yet to pass on the question.

### A. *Legislative History of Title III*

The Government contends that "Congress simply neglected to address the obvious" and that authority to sanction break-ins is implicit in the provision of Title III permitting bugging. Appellants contend that Title III's attempts carefully to circumscribe invasions of privacy are inconsistent with congressional intent to legalize break-ins. A meticulous review of the legislative history of Title III convinces us that the appellants are correct.

Title III constitutes "a comprehensive scheme for the regulation of wiretapping and electronic surveillance." (*Gelbard v. United States* (1972) 408 U.S. 41, 46, 92 S.Ct. 2357, 33 L.Ed.2d 179.) As Chief Justice Burger noted in his concurring opinion in *United States v. Donovan* (1977) 429 U.S. 413, 441, 97 S.Ct. 658, 675, 50 L.Ed.2d 652 (Burger, C. J., partial concurrence):

> "Congress drafted this statute with exacting precision. As its principal sponsor, Senator McClellan, put it: '[A] bill as controversial as this . . . requires close attention to the dotting of every "i" and the crossing of every "t" . . . .' Under these circumstances, the exact words of the statute provide the surest guide to determining Congress' intent, and we would do well to confine ourselves to that area. [Citation omitted.]"

We have also recognized the significance of Title III's specificity. In *Application of United States* (9th Cir. 1970) 427 F.2d 639, 643, we observed that Title III "purports to constitute a comprehensive legislative treatment of the entire problem of wiretapping and electronic surveillance, complete with extensive introductory Congressional findings. The provisions contained in Title III state, in precise terms, what wiretapping and electronic surveillance is prohibited, and what is permissible. As to the latter, meticulous provision is made with respect to the necessity and manner of obtaining prior or subsequent judicial approval, the use which may be made of intercepted information, the way in which aggrieved persons may test the validity of the interception, and the collection and transmission to Congress each year of information concerning such activity." (*See also United States v. King* (9th Cir. 1973) 478 F.2d 494.)

Congressional intention to delineate explicitly the extent to which the courts were empowered to grant orders permitting electronic surveillance is evidenced throughout the legislative history of Title III. Nowhere in the provisions of Title III, the

---

1. Congressional silence on the issue has been noted by other Circuits. (*United States v. Agrusa* (8th Cir. 1976) 541 F.2d 690, 698–99; *Application of United States* (4th Cir. 1977) 563 F.2d 637, 642. *See also* the report issued by the national commission established by Congress to review the operation of Title III, National Commission for Review of Wiretapping and Electronic Surveillance, *Electronic Surveillance* 83 (1976).

Committee Reports, or the debates in Congress is authority for surreptitious entries permitted. In the entire history of the statute, the conclusion is inescapable that the omission was purposeful and that congressional silence cannot be filled by implication of such authority.[2] "[T]he protection of privacy was an overriding congressional concern [in enacting Title III]." (*Gelbard v. United States, supra,* 408 U.S. at 48, 92 S.Ct. at 2361.) The congressional will was expressed in no uncertain terms in the Senate Committee Report on Title III:

"Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers . . . [with] a court order obtained after a showing and finding of probable cause."

(S.Rep. No. 1097, 90th Cong., 2d Sess. 66 (1968), U.S.Code Cong. & Admin.News 1968, pp. 2112, 2153.)

The bulk of Title III's provisions are efforts to restrict very narrowly the use of electronic surveillance to safeguard privacy. (*See, e. g., United States v. United States District Court* (1972) 407 U.S. 297, 301–02, 92 S.Ct. 2125, 32 L.Ed.2d 752; *Application of United States, supra,* 427 F.2d at 643; *United States v. King, supra,* 478 F.2d at

498. *See also* S.Rep. No. 1097, 90th Cong., 2d Sess. 69 (1968).)

In enacting Title III, Congress was fully aware that legislative safeguards to protect privacy were essential if electronic surveillance by law enforcement officers was to pass constitutional muster. (*See, e. g., Application of United States, supra,* 427 F.2d at 643; *United States v. Kalustian* (9th Cir. 1975) 529 F.2d 585, 589.) Title III was enacted, in part, as a response to decisions of the Supreme Court in *Berger v. New York* (1967) 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 and *Katz v. United States* (1967) 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. Before the *Berger* decision, wiretapping was prohibited by the Federal Communications Act of 1934, but bugging was legal as long as it was not accomplished by an unauthorized physical trespass.[3] (No federal statute prohibited bugging, but bugging accomplished by a physical trespass was held to violate the Fourth Amendment. *Silverman v. United States* (1961) 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734. Evidence obtained by bugging accomplished without a physical trespass was admissible in federal courts. *Goldman v. United States* (1942) 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322. Congress knew the state of the law in this area. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 67–69 (1968), and President's Commission of Law Enforcement and the Administration of Justice, *The Challenge of Crime in a Free Society* 202–03 (1967).)

Implicit in the *Berger* decision was the notion that Fourth Amendment protections

**2.** Congressional silence on this issue is as eloquent as congressional silence on authority for national security wiretapping in Title III. (*See United States v. United States District Court* (1972) 407 U.S. 297, 306, 92 S.Ct. 2125, 32 L.Ed.2d 752.) The question whether Government agents should be permitted to break into homes and businesses to place bugging devices is surely as complex and important a problem as wiretapping to protect national security. Moreover, our conclusion is reinforced by the fact that when Congress eventually chose to authorize trespassory bugging in national security cases, it required that both the application and intercept order explicitly state that "physical entry is required to effect the surveillance." (Foreign Intelligence Surveillance Act of 1978, §§ 2524(a)(8), 2525(b)(1)(D), S. 1566,

95th Cong., 2d Sess. (as passed by the Senate, April 20, 1978). 124 Cong.Rec.S. 6014 (1978). *See also* 124 Cong.Rec.S. 5995 (1978) (remarks of Senator Kennedy).) Congress also required that the judge specify the precise means to be used in effecting national security surveillances.

**3.** Section 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605, had been held to prohibit the use of evidence obtained by wiretapping in proceedings in federal courts. (*Nardone v. United States* (1937) 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314; *Benanti v. United States* (1957) 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126.)

applied not only to physical trespasses, but also to conversations. *Berger* struck down New York's electronic surveillance statute because the statute on its face permitted the seizure of conversations without sufficiently narrow warrant procedures. Six months later in *Katz v. United States, supra,* the Supreme Court held for the first time that the Fourth Amendment protected conversations as well as premises, and that eavesdropping by non-parties to private conversations could be constitutionally conducted only when authorized by a court order. Congress knew that *Berger* and *Katz* established that even evidence obtained by non-trespassory bugging was inadmissible in absence of carefully circumscribed procedure for the issuance of court orders. Title III was a congressional attempt to provide such procedure.

The history of Title III is revealing. The original bill that was the foundation for Title III was S. 675, a bill introduced by Senator McClellan on January 25, 1967. (S.Rep. No. 1097, 90th Cong., 2d Sess. 225 (1968) (Individual views of Senators Dirksen, Hruska, Scott, and Thurmond).) Under the McClellan bill, federal law enforcement officers could apply for a court order to wiretap; the bill did not attempt to legislate with respect to bugging. (*See* 114 Cong.Rec. 13209 (1968).) At the time the McClellan bill was introduced, the Supreme Court had not decided *Berger,* and thus evidence obtained by non-trespassory bugging was still admissible in the federal courts. As initially drafted, S. 675 would have legalized law enforcement wiretapping under some circumstances, and it would have left the law on bugging unchanged. Thus, S. 675, the foundation of Title III, deliberately left intact the pre-*Berger* law that permitted only non-trespassory bugging.

After S. 675 was introduced, the Court handed down *Berger.* The initial legislative response was a bill introduced by Senator Hruska, S. 2050, called The Electronic Surveillance Act of 1967. (*See Controlling Crime through More Effective Law Enforcement:* Hearings before the Subcommittee on Criminal Laws and Procedure of

the Senate Judiciary Committee, 90th Cong., 1st Sess. 958 (1967) (Statement of Senator Hruska).) As the committee report explained: "S. 2050 was introduced in the wake of the Supreme Court's decision of *Berger v. New York.* It was tailored to meet the constitutional requirements imposed by that decision." (S.Rep. No. 1097, 90th Cong., 2d Sess. 224 (1968) U.S.Code Cong. & Admin.News 1968, p. 2274. (Individual views of Senators Dirksen, Hruska, Scott, and Thurmond).)

Title III is almost a verbatim combination of the provisions of the McClellan and Hruska bills. The McClellan bill did not deal with bugging. However, the Hruska bill permitted law enforcement officials to engage in bugging, but it contained no provision authorizing trespasses or break-ins to plant bugging devices. Senator Hruska's intent was to expand the legislation to cover bugging in order to ban private bugging altogether, while establishing very strict controls on the use of bugging by state and local law enforcement officers. He told Senator McClellan: "Your wiretapping bill, S. 675, gets at the difficult problem of wiretapping. I have co-sponsored it and generally support it. However I feel the ban contained in this bill should also apply to eavesdropping. I now feel it should be prohibited generally with well-defined exceptions with adequate and effective controls on its authorization and use at state and local levels." (*Controlling Crime through More Effective Law Enforcement, supra,* 90th Cong., 1st Sess. 7.) There is not the slightest suggestion in Senator Hruska's remarks to indicate any intent on his part to overturn the long-established *Silverman* doctrine that evidence obtained by trespassory bugging was inadmissible as a violation of the Fourth Amendment. On the contrary, his explanation of his bill showed his intent to conform to all of the Supreme Court authorities controlling electronic surveillance, including both the *Silverman* doctrine and *Berger.*

None of the *Berger* and *Katz* restrictions grafted onto Title III indicate an intent to authorize break-ins in the course of law

enforcement bugging operations. Although *Katz* moved the Fourth Amendment away from wooden trespassory concepts, nothing in *Katz* implied any constitutional blessing upon trespassory buggings. Congress correctly read *Berger* and *Katz* as proscribing unwarranted bugging even when conducted by non-trespassory means. The authors of Title III sought to permit law enforcement bugging under such stringent safeguards that a very limited class of law enforcement eavesdropping could resume. (*E. g.,* S.Rep. No. 1097, 90th Cong., 2d Sess. 27, 66, 74, 75, 88–108 (1967). *See also* 114 Cong.Rec. 14728 (1968) (Sen. Tydings, Co-manager of Title III: "The *Katz* case does provide limited and rigid restrictions. The intent of this bill is to conform to the principles of the *Katz* case . . ..").) Senator McClellan, during the floor debates on Title III stated: "Every safeguard that is practical and necessary to protect the legitimate rights of privacy is incorporated in the bill. The committee took guidance from the Supreme Court decisions and had the wisdom to ferret out, construct it, and make it a part of the provisions of this title. They are all in there." (114 Cong.Rec. 11231 (1968).)

The Government argues that Congress intended to authorize break-ins to plant bugging devices because (1) Congress was well aware of the Supreme Court decisions on electronic surveillance, including *Berger* and *Katz,* which it says impliedly permit trespasses to implant bugging devices if authorized by court order, and (2) Congress knew that break-ins were necessary to plant bugging devices and thus must have intended to authorize break-ins. The Government's argument rests upon misreadings of the legislative history and *Katz* and *Berger.*

Congress knew that the Fourth Amendment protected both conversations and premises. Congress correctly read *Katz* and *Berger* as lending Fourth Amendment protection not only to intrusions accomplished by technical trespasses and the seizure of tangible items, but also the "seizure" of oral statements without any breaking-in or technical trespass. (The entire

text of the *Katz* decision was read into the record during the legislative debates on Title III. 114 Cong.Rec. 14725 (1968). Detailed analyses of the meaning of the *Berger* and *Katz* decisions were also a part of the legislative record. 114 Cong.Rec. 12986–12988 (1968). *See also* S.Rep. No. 1097, 90th Cong., 2d Sess. 74–75, 88–108 (1967).) *See also United States v. United States District Court, supra,* 407 U.S. at 313, 92 S.Ct. 2125. Neither *Berger* nor *Katz* overruled that part of the *Silverman* doctrine proscribing electronic bugging accomplished by trespass. Although *Berger* involved a situation in which a trespass had been used to plant a bugging device, the Court did not address the break-in question because it decided that the New York statute was unconstitutional on its face. (*Berger v. New York, supra,* 388 U.S. 41, 44, 64, 87 S.Ct. 1873, 18 L.Ed.2d 1040.) The facial nature of the *Berger* decision was emphasized by then Circuit Judge John Paul Stevens in *United States v. Ramsey* (7th Cir. 1974) 503 F.2d 524, 528–30. *Katz* extended, rather than restricted, constitutional protection against electronic surveillance. As the Supreme Court noted in *Alderman v. United States* (1969) 394 U.S. 165, 180, 89 S.Ct. 961, 970, 22 L.Ed.2d 176:

"Nor do we believe that *Katz,* by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home or to overrule the existing doctrine, recognized at least since *Silverman,* that conversations as well as property are excluded from the criminal trial when they are found to be the fruits of an illegal invasion of the home."

Congress was fully aware that not all bugging required trespasses, let alone break-ins. The most common form of electronic eavesdropping is "participant electronic surveillance," in which an informant equipped with hidden recording devices gains access to the home or office by non-trespassory means and surreptitiously records conversations. (*E. g., United States v. White* (1971) 401 U.S. 745, 91 S.Ct. 1122, 28

L.Ed.2d 453; *Lopez v. United States* (1963) 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462; *On Lee v. United States* (1952) 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270). Moreover, *Katz* itself involved entries neither into a home nor an office, but rather the affixing of a bugging device to the outside of a public telephone booth.

We agree with the Government that Congress "was aware of the entry problem." But we disagree that from that awareness Congress chose to grant authority to permit either break-ins or technical trespasses to install bugging devices by implications derived from its silence. In support of its contention that Congress intended otherwise, the Government cites one phrase from the language of Title III, two excerpts from the legislative debate, and one excerpt from the Senate Committee Report. First, the Government notes that Title III requires the intercept application to describe "the facilities from which or the place where the communication is to be intercepted." (18 U.S.C. § 2518(1)(b)(ii).) We cannot infer from this language any congressional intent to permit trespasses or break-ins. The "place where the communication is to be intercepted" could be a telephone booth, as it was in *Katz,* or some other public place, as well as the outside of a dwelling or an office building. Next, the Government cites the Senate Report on Title III that mentioned that bugging devices may take several days to install. (S.Rep. No. 1097, 90th Cong., 2d Sess. 103 (1967).) If any implication concerning trespass is appropriately drawn from this passage, it is that Congress had in mind the difficulty of gaining consensual entry to premises that the Government wanted to bug. The mechanics of installing a bugging device can be performed very quickly; the difficulty encountered is gaining entry by legal means.

The Government next cites the statement of Senator Tydings, Co-manager of Title III:

"Second, surveillance is very difficult to use. Tape [*sic*] must be installed on telephones and wires strung. Bugs are difficult to install in many places since sur-

reptitious entry is often impossible. Often, more than one entry is necessary to adjust equipment. Static and room noise interfere. Devices can be discovered. Wireless transmission can be intercepted."

(114 Cong.Rec. 12989 (1968).) When Senator Tydings' statement is read in context, it is evident that he did not use "surreptitious entry" as a synonym for burglary, break-ins, or trespass. Rather, he was referring to the reasons why the New York County District Attorney's office had averaged only 75 wiretaps and 19 bugs per year under the New York eavesdropping law which was struck down in *Berger.* Senator Tydings' total statement was an argument that invasions of privacy would be minimized because Title III heavily safeguarded rights of privacy and because legitimate entries under the legislation were nevertheless difficult. Senator McClellan repeatedly told the Senate how much tighter the Title III scheme was than New York's legislation. "The statute we propose here (Title III) is much stricter than the New York statute. . . . The proposal before us today is more strict, there are more requirements, and it is more difficult to meet the test to get the order than it was in New York." (114 Cong.Rec. 11231 (1968).) Congress was not trying to replicate the New York bugging scheme which had been invalidated by the Supreme Court.

The Government also cites a statement by Senator Morse, an opponent of the bill, when he argued:

"I know that elaborate efforts are made to distinguish between a real wiretap, or bug, which requires someone to intrude upon private premises to install. That kind of invasion is truly a search, requiring a warrant under conditions set forth in article 4. But electronic surveillance, whereby conversations can be picked up from scores of feet away, without any physical intrusion upon the premises involved, is a far more insidious invasion of privacy, and one which I do not believe should be tolerated at all."

(114 Cong.Rec. 11598 (1968).)

The Government's argument that Senator Morse's statement indicates a congressional

belief that break-ins are essential to any bugging operation eludes us. As nearly as we can ascertain from his Delphic statement, Senator Morse expressed his distaste for electronic surveillance, his belief that an intrusion upon private premises to install a bug required issuance of a search warrant (something not addressed in Title III), and suggested that he understood the bill only to authorize non-trespassory bugging. As we read Senator Morse's argument, together with arguments propounded by other opponents of the bill, none of them read Title III as permitting burglaries or break-ins. Rather, they launched broad-gauged attacks on non-trespassory means of electronic surveillance. (*E. g., see* 114 Cong. Rec. 14482 (1968); 114 Cong.Rec. 14732 (1968).)

Other passages in the legislative history strongly support the conclusion that Congress did not intend to permit court-ordered break-ins to install bugging devices. Congress knew that existing federal law prohibited police from breaking into private premises to conduct a search without knocking first. (18 U.S.C. § 3109 permits officers to break into homes to execute a search warrant only if they have knocked and have been refused permission or "when necessary to liberate" the officer or a person aiding him.) Senator Hugh Scott explicitly mentioned this legislation during the debates on Title III. He discussed his support for the then pending bill permitting forcible entry without knocking, but he did not advocate its use in connection with eavesdropping orders. (114 Cong.Rec. 13200 (1968).)[4] Both Senator Scott and other members of

the Senate knew that federal law prohibited surreptitious entries by police executing search warrants, but Congress did not amend 18 U.S.C. § 3109 to authorize surreptitious entries to plant bugging devices. Nor can we assume that Congress was ignorant of *Miller v. United States* (1958) 357 U.S. 301, 313, 78 S.Ct. 1190, 2 L.Ed.2d 1332: "The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application. Congress, codifying a tradition embedded in Anglo-American law, has declared in § 3109 the reverence of the law for the individual's right of privacy in his house." (*See also Sabbath v. United States* (1968) 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828.)[5]

### B. *Decisions of Other Circuits*

We agree with the holding of the Sixth Circuit in *United States v. Finazzo, supra,* that neither Title III, nor any other statute, empowers district courts to authorize break-ins to plant bugging devices. As the *Finazzo* court noted: "It simply does not make sense to imply Congressional authority for official break-ins when not a single line or word of the statute even mentions the possibility, much less limits or defines the scope of the power or describes the circumstances under which such conduct, normally unlawful, may take place." (*United States v. Finazzo, supra,* 841.)

Although we agree with the Sixth Circuit's holding, we do not concur in that portion of its reasoning that equates an eavesdrop order with a search warrant for Fourth Amendment purposes.[6] But we do

---

**4.** Senator Scott was then unaware of the storm of protest which the proposed no-knock legislation ultimately encountered.

**5.** The vigorous debate that raged over "no-knock" legislation in 1970 is also instructive. Some of the supporters of Title III's eavesdropping authority were among the most lively opponents of the "no-knock" bill. For example, Senator Ervin, a co-sponsor of Title III, denounced the no-knock provisions on the grounds that police should not be given even judicially approved authority to enter private premises without knocking and announcing their purpose. He expressed his views in lan-

guage which was characteristically colorful, declaring the District of Columbia crime bill to be "as full of unwise and unconstitutional provisions as a mangy hound dog is full of fleas." (116 Cong.Rec. 8918 (1970).)

**6.** It is more than a quibble with the reasoning of *Finazzo* that we cannot accept the Sixth Circuit's description of a court order for electronic interception as an "eavesdrop warrant." (*United States v. Finazzo* (6th Cir. 1978) at 842.) Court-ordered electronic surveillance orders do not resemble search warrants, except for the existence of a neutral magistrate. Search warrants are not executed surrepti-

not reach the constitutional issues because we hold that the break-in order violated Title III, and evidence obtained pursuant to the invalid portion of the order was excluded by Title III itself.

The reasoning of the opinions from the Second, Third, Fourth, and Eighth Circuits does not commend itself to us. The Second and Third Circuit panels reached their conclusions without any review or analysis of the legislative history of Title III, the impact of Section 3109, or the Supreme Court authorities which were an integral part of the legislative history of Title III. The analysis in *United States v. Scafidi, supra,* 564 F.2d 633, consists almost entirely of the court's conclusions that Title III left the means of installing a bug to the discretion of law enforcement personnel after a judicial officer had decided that an electronic surveillance will aid in the detection of crime and that the installation of a bug, of necessity would require surreptitious entry "for no self-respecting police officer would openly seek permission from the person to be surveilled to install a 'bug' to intercept his conversations." (564 F.2d at 640.) The opinion in *United States v. Dalia, supra,* 575 F.2d 1344, follows *Scafidi* with virtually no independent analysis.

*Application of United States, supra,* 563 F.2d 637, recognized that Title III is completely devoid of any explicit language authorizing surreptitious entries of private premises for the purpose of installing bugs. The court nevertheless implied authority for court-authorized break-ins on the theory that trespassory entries were necessary to implement congressional intent to control organized crime. "[T]he fact that Title III does not expressly limit the manner of installing listening devices is, in the light of the announced legislative intent [to combat organized crime], consistent with the conclusion that Congress implicitly commended the question of surreptitious entry to the informed discretion of the district judge, subject to the commands of the Constitution." (563 F.2d at 643.) [7]

Although the legislative history of Title III reveals that Congress was concerned about the control of organized crime, the history demonstrates that the overriding concern was the protection of privacy. The legislative history simply does not support the inference that Congress intended by its silence implicitly to authorize an order permitting a break-in to install a listening device because it believed that such authority was required to detect illegal activities by members of organized crime.

The majority of the court in *United States v. Agrusa, supra,* 541 F.2d 690, held that a forcible entry into the appellant's business premises to plant a bug violated neither federal statutory law nor the Con-

tiously, and they are always limited to things in being which the officers have probable cause to believe are contraband, or, at the very least, evidence connected with a crime that has already been committed. Warrant procedure permits the person subjected to the search to have notice of the fact of the search, and it also provides him with an opportunity to move to quash the warrant, to demand return of whatever has been seized, and otherwise to challenge the validity of the warrant or the action taken under its authority. These protections are either non-existent or irrelevant in respect of court-authorized orders for electronic surveillance, even absent a break-in. Unlike an arrest warrant, or a search warrant, a court order authorizing an electronic surveillance with or without a break-in, is not a step in an adversary process, but rather a step in an ongoing investigation which may never lead to nor permit adversary challenge.

7. The court also appears to rely, somewhat obscurely on *Berger v. New York, supra,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040, to support its conclusion that Congress intended to permit break-ins. The court noted that Congress was familiar with *Berger v. New York.* The court then added "[w]hile the decision in *Berger* went off on other points, the opinion clearly reveals that the interception under scrutiny was accomplished by means of a bugging device surreptitiously planted in the target office. [Citation omitted] The Court, however, did not order the suppression of the collected *evidence on that basis."* (563 F.2d at 643 n.5.) The reference at least suggests that the panel thought that there was some kind of an implied approval for surreptitious entry in *Berger* by reason of its failure to order the collected evidence suppressed when the interception had been in fact accomplished by a break-in. In our view, the *Berger* opinion provides no basis for any such implication.

stitution. The statutory discussion focused entirely upon 18 U.S.C. § 3109. The court concluded that law enforcement officers, pursuant to express court authorization to do so, could forcibly and without knock or announcement break and enter business premises in the nighttime to install an electronic surveillance device. Non-compliance with the knock and announce requirements of the statute was justified by "exigent circumstances." As interpreted in *Agrusa*, "exigent circumstances" were present because an announcement preceding the officers' entry would permit the person under surveillance to avoid any incriminating statements. The court equated the imminent destruction of existing evidence with the non-creation of incriminating evidence. Adoption of this extraordinary reasoning would destroy the fundamental protections of the Fourth Amendment, as well as the values that Section 3109 was intended to protect.[8] The *Agrusa* court did not con-

sider the question whether a break-in to plant a bug was a violation of Title III.[9]

The language of Title III, together with its legislative history, convincingly demonstrates that Congress did not intend to authorize break-ins to implant listening devices within private premises.[10]

### C. Suppression of the Fruits of the Illegal Entry

Both the legislative history and the text of Title III also convincingly demonstrate Congress' intent that interception of conversations, by wiretapping or by bugging, which was not authorized by the legislation was illegal and that the fruits of such illegal interceptions must be excluded from evidence. Title III directs that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or

---

**8.** *See* note 6, *supra.*

**9.** Judge Lay, dissenting, was unconvinced that "effective enforcement of our criminal laws requires government agents to break and enter private premises, like common burglars, to plant eavesdropping devices." (541 F.2d at 702. He also explained why the majority misconstrued and misapplied *Ker v. California* (1963) 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726; *Sabbath v. United States* (1968) 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828; *Katz v. United States, supra,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576; and 18 U.S.C. § 3109.

**10.** The 1970 amendments to Title III (18 U.S.C. §§ 2511(2)(a)(ii), 2518(4)(e), 2520) are not relevant. The amendments expressed congressional intent that the general ban on electronic surveillance (1) did not render unlawful co-operation by any communication common carrier with law enforcement officers in intercepting wire or oral communications, and (2) permitted a court order authorizing interception of wire or oral communications to "direct that a communication common carrier, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier, landlord, custodian, or person is according the person whose communications are to be intercepted." No communication common carrier, landlord, custodian, or other similar person was involved in this break-in. Finally, the

1970 amendments included a provision that good faith reliance on a court order or legislative authorization was a "complete defense to any civil or criminal action brought under this chapter or under any other law." This amendment was intended to insulate telephone companies and other cooperating agencies from criminal or civil liability for assisting Government officials in tapping their customers' telephones. (*See* Senator McClellan's explanation of the amendments, 115 Cong.Rec. 37192 (1969).)

Rule 41(b) of the Federal Rules of Criminal Procedure is likewise irrelevant. In the first place, Rule 41(b) contemplates the issuance of a search warrant, and in the second place, the rule does not apply to the issuance of intercept orders. In applying Rule 41 to uphold a district court order requiring a telephone company to assist law enforcement agents in installing a pen register, the Supreme Court in *United States v. New York Telephone Co.* (1977) 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376, emphasized the facts that the legislative history of Title III clearly indicated congressional intent that pen registers were permissible and that interception of electrical impulses by pen registers was a far lesser intrusion than an electronic surveillance because pen registers do not capture any conversations. Nothing in Rule 41 nor in the *New York Telephone* decision carries any implication that break-ins, absent the full panoply of protections of the search warrant, are statutorily or constitutionally permissible.

before any court . . . of the United States . . . if the disclosure of that information would be in violation of this Chapter." (18 U.S.C. § 2515.)

As the Supreme Court explained in *Gelbard v. United States, supra*, 408 U.S. at 46, 92 S.Ct. at 2360: "If a wire or oral communication is intercepted in accordance with the provisions of Title III, the contents of the communication may be disclosed and used under certain circumstances. 18 U.S.C. § 2517. Except as expressly authorized in Title III, however, all interceptions of wire and oral communications are flatly prohibited. . . . Title III also bars the use as evidence before official bodies of the contents and fruits of illegal interceptions, 18 U.S.C. § 2515, and provides procedures for moving to suppress such evidence in various proceedings, 18 U.S.C. § 2518(9)–(10)." The officers' breaking and entry of Santora's office to implant the bug was unauthorized by Title III, and any and all conversations that were intercepted by the bugging operation and evidence derived from those interceptions should have been suppressed, in accordance with Title III.

Our conclusion that the evidence should be suppressed is based solely on statutory grounds. In reaching that conclusion, however, we are not unmindful that a contrary reading of the statute would raise serious Fourth Amendment questions. (*Silverman v. United States, supra*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 "Eavesdropping accomplished by means of such a physical intrusion is beyond the pale of even those decisions in which a closely divided Court has held that eavesdropping accomplished by other electronic means did not amount to an invasion of Fourth Amendment rights." (*Id.* at 509–10, 81 S.Ct. at 682.).) In *Irvine v. California* (1954) 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561, a pre-*Mapp* decision, the Court noted that state officers' entry of the petitioner's home without a search warrant

for the purpose of planting a listening device "would be almost incredible if it were not admitted. Few police measures have come to our attention that more flagrantly, deliberately, and persistently violated the fundamental principle declared by the Fourth Amendment . . . ." (347 U.S. at 132, 74 S.Ct. at 383.) [11]

Our examination of the entire record of this case, including all of the sealed reports of the Strike Force attorney to the district court, reveals that the Government's harvest of incriminating evidence from its break-in and bugging was very modest. Santora is the only appellant who has standing to challenge the use of this evidence. None of the other appellants had any interest in the premises broken into, nor were they parties to any conversation intercepted by the bug.

The bug picked up three conversations in which Santora made incriminating statements. While none of these conversations was admitted into evidence against Santora, they were used to obtain two additional interception orders: Order No. 4700, which authorized the tapping of five additional phones, and Order No. 4719, which extended the period of authorized surveillance of Santora's office. We are unable to separate the conversations obtained from the illegal bugging operation from evidence obtained pursuant to the legal wiretapping, both of which were relied upon to supply probable cause for these additional intercept orders. Therefore, the evidence secured against Santora by surveillance pursuant to Orders No. 4700 and 4719 should have been suppressed. Court Order No. 4676, which permitted tapping of a public phone outside of Santora's office, was obtained without any use of the fruits of the illegal bug. Thus, the conversations intercepted by this tap, together with the fruits of those interceptions, were admissible against Santora.

11. We do not imply that Fourth Amendment protection depends upon the existence of a physical trespass. Rather, we are recognizing that *Katz* in no way eroded the traditional "core" of the Fourth Amendment protection against physical entry of private premises when it extended protection to private speech. (*E. g., United States v. United States District Court, supra*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752; *Alderman v. United States, supra*, 394 U.S. 165, 177–78, 89 S.Ct. 961, 22 L.Ed.2d 176.)

This does not mean that the untainted evidence may be inadequate to convict him. The record indicates that much of the Government's evidence against Santora was obtained by the initial, legal wiretapping of Santora's phones. However, we cannot from the record before us separate the untainted from the tainted evidence. The district court did not have occasion to do so because it upheld the legality of all of the interceptions. Accordingly, we vacate Santora's conviction and remand the case to the district court. On remand, the parties may reopen the stipulation upon which the conviction was founded, including the stipulated dismissal of other counts charged against Santora. Santora may renew his suppression motion based on the principles announced in this decision. All evidence against Santora that is the fruit of the illegal bugging or intercept Orders No. 4700 and 4719 (including the products of search warrants supported by such evidence) must be suppressed on remand.

## V. ADEQUACY OF THE GOVERN-MENT'S SHOWING UNDER SECTION 2518(1)(c)

▮ Congress sought to limit the use of electronic surveillance by law enforcement officers to circumstances in which normal investigative procedures are unlikely to succeed. Section 2518(1)(c) of Title III, 18 U.S.C. § 2518(1)(c), requires applications for intercept orders to contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Before approving an intercept order, a judge must determine "on the basis of the facts submitted by the applicant" that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." (18 U.S.C. § 2518(3)(c).)

The initial application of the Government for authority to tap and bug the AAA Appliance Company contained a number of statements outlining the reasons why nor-mal investigative procedures would be unlikely to succeed. The Government's affidavit related how two undercover agents who had entered the appliance company and pretended to be interested in purchasing a vacuum cleaner had been spotted as law enforcement officers by Santora. The affidavit stated that the Government's two confidential informants refused to testify because they feared "the violent nature of Ronald Santora and Earl Lee Rardin." The arrest records of Santora and Rardin were presented in the affidavit to establish that they were "longtime participants in continuing criminal activity" who would not testify before a grand jury even if they were granted immunity from prosecution. One attempt to infiltrate the group was unsuccessful, the affidavit alleged, because Ronald Santora had "personally rejected" the undercover agent. Physical surveillance and search warrants would not crack the conspiracy, the affidavit also noted. The Government's affidavit was signed and sworn to by Jack D. Blair, a Special Agent of the FBI.

The statements of the affidavit, taken as a whole, presented a sufficient showing under Section 2518(1)(c) to support the initial Order No. 4651, that authorized tapping Santora's telephones at the AAA Appliance Company. For the purposes of the initial intercept order, the Government's affidavit was sufficiently specific to meet the standards we applied in *United States v. Kalustian, supra,* 529 F.2d 585.

But this does not mean that once the Government has established the inadequacy of investigative alternatives relating to certain suspects, it may then dispense with the required showing when applying to tap the telephones of other conspirators. As we pointed out in *United States v. Abascal, supra,* 564 F.2d at 826: "It is not enough that the agents believe the telephone subscribers they wish to tap are all part of one conspiracy. Less intrusive investigative procedures may succeed with one putative participant while they may not succeed with another."

While the Government's first affidavit was sufficient to support the initial intercept order, it was not sufficient to establish that alternative investigative techniques would not succeed with respect to other suspected conspirators whose telephones were later tapped. On May 2, 1975, intercept Order No. 4700, which permitted the tapping of five additional telephones, was issued. To support the claim that normal investigative techniques were inadequate, the Government relied almost entirely on its previous affidavit. A new affidavit by Special Agent Blair was filed and it "incorporated by reference" his prior statements in support of Order No. 4651.[12] The affidavit in support of the order failed to recite that any specific efforts had been made by federal agents to investigate the activities of those persons whose telephones were to be tapped to discover each of those individuals' complicity in the offenses. Reference to the previous affidavit was insufficient to meet the requirements of Section 2518(1)(c) because the statements made in that affidavit focused on the difficulties in infiltrating the portion of the conspiracy that operated out of the AAA Appliance Company. No showing was made that normal investigative techniques would be unlikely to uncover the activities of the other alleged conspirators whose telephones were tapped under intercept Order No. 4700.

We hold that the Government failed to comply with Section 2518(1)(c) in its application for intercept Order No. 4700. Each of the appellants who participated in conversations intercepted under this order have standing to object. Thus, all evidence obtained by the five telephone taps authorized by Order No. 4700 must be suppressed as against participants in the intercepted conversations. The fruits of this illegal tapping, including the products of search warrants based on the intercepted conversations, must also be suppressed.

The convictions of Cohn, Sohn, and Upton must be reversed because the admissible evidence against them was plainly insufficient. Each of their convictions was based almost wholly on evidence obtained by the illegal taps. And each of these defendants has standing to object to the illegal interceptions. Cohn's conviction was based solely on four communications intercepted by wiretapping pursuant to invalid Order No. 4700. These conversations, which occurred on May 5 and May 7, 1975, at most raise some suspicion that Cohn was involved in narcotics traffic with Paul Harmon. Since Cohn's conversations must be suppressed, his conviction must be reversed for insufficient evidence. Because Cohn cannot be retried (*Greene v. Massey* (1978) 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15), we need not reach the question whether his right to a speedy trial was violated.

Sohn's conviction was based on her telephone conversations with Paul Harmon on May 13, 18, 19, 20, 21, and 24, 1975. The telephone used by Harmon had been tapped by authority of intercept Order No. 4700. Because this order was invalid, all of Sohn's intercepted conversations must be suppressed. The other evidence against Sohn was the product of a search of her apartment on May 24, 1975. This search was authorized by a search warrant issued on

---

12. The only additional statements were as follows: "[T]he interception of wire communications over telephone numbers 213–753–5221 and 213–778–0033 reveal that Ronald Santora not only uses those telephones in carrying out the offenses described herein, but employs or associates with other individuals who also use the telephones described in this affidavit to make arrangements which further the illegal activities in which Ronald Santora and others are involved.

"Although Ronald Santora has made various arrangements with other members of this conspiracy over telephone numbers 213–753–5221 and 213–778–0033, Santora is not solely responsible for the personal arranging for obtaining illegal contraband nor is he solely responsible for the personal arranging for selling illegal contraband. In order to fully identify the conspirators taking part in the violations alleged, it is necessary to monitor the conversations over telephone numbers requested in this affidavit. "While special agents of the Federal Bureau of Investigation have been able to observe Ronald Santora meet with other conspirators in this alleged conspiracy, those observations alone have been insufficient in themselves to identify the nature of the conversations and transactions which have taken place."

the basis of facts supplied by the intercepted conversations. Because the warrant was the fruit of the illegal wiretapping, the search of Sohn's apartment was invalid, and the evidence obtained by the search must also be suppressed. Without the suppressed evidence, Sohn's conviction cannot stand.

Upton's conviction must also be reversed. Upton had incriminating conversations with Lee Henry Shook on May 16 and 18, 1975. These conversations were intercepted by a tap on Shook's phone that had been authorized by Order No. 4700. When these conversations are suppressed, the remaining evidence against Upton (a telephone conversation on May 16 to which Upton was not a party, and the inconclusive results of a search which may itself be tainted) is insufficient to support his conviction.

On the record before us we are unable to determine whether there is sufficient admissible evidence to support the convictions of the remaining defendants. Thus, we vacate the convictions of Evans, Rardin, Lickteig, and Moore, and remand their cases to the district court for further proceedings. Although much of the evidence against Evans was derived from an illegal tap on her telephone (pursuant to Order No. 4700), other evidence against her was obtained by the initial, legal wiretaps on the AAA Appliance Company phones. On remand, the stipulation between Evans the the Government may be reopened, and her motion to suppress may be renewed.

Some of the evidence against Lickteig was derived from a legal tap, while other evidence appears to be a product of the invalid Order No. 4700. On remand, Lickteig may renew his motion to suppress evidence obtained from the invalid taps, including the fruit of any searches obtained by warrants tainted by the illegal taps. Lickteig's challenges to the indictment and jury instructions are not well taken. The wording of the indictment was sufficient, and the court adequately covered conspiracy in its instructions to the jury.

The evidence against Moore was derived from telephone conversations between Moore and Evans, intercepted pursuant to the illegal tap on Evans' telephone. This evidence must be suppressed. On remand, the district court should determine whether the warrant authorizing the search of Moore's premises was based upon the same evidence. If so, the products of the search must also be suppressed.

While Rardin's conversations appear to have been intercepted legally, on remand the district court should determine whether the search of Rardin's residence was the product of any illegal interceptions that Rardin has standing to challenge.

The convictions of Cohn, Sohn, and Upton are reversed. The convictions of Santora, Evans, Rardin, Lickteig, and Moore are vacated and the causes are remanded to the district court for further proceedings consistent with the views herein expressed.